# EXCERPTS FROM DEPOSITION OF

# JOSEPH R. PETRUCELLI

## Re: Motion to Exclude Expert Testimony

*Redditt Alexander and Ida Lee Alexander v. Countrywide Home Loans, Inc., et al*
**In the United States District Court for the Southern District of Mississippi;
Southern Division;
Civil Action No: 1:07-cv-1056-HSO-JMR**

# EXHIBIT "A"

Alexander vs Countrywide Home (final).txt

0001
1
                    IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                         SOUTHERN DIVISION
3
4        --------------------------  )
         REDDITT ALEXANDER, AND IDA  )   CIVIL ACTION NO.
5        LEE ALEXANDER,              )   1:07cv1056-HSO-JMR
                                     )
6                    Plaintiffs,     )
                                     )   DEPOSITION OF:
7              -vs-                  )
                                     )   JOSEPH PETRUCELLI
8        COUNTRYWIDE HOME LOANS,     )
         INC., and JOHN DOES 1-10,   )
9                                    )
                     Defendant.      )
10       --------------------------  )
11
12                Transcript of proceedings taken at the
13       office of PP&D Accounting Services, Inc., 263
14       Main Street, Woodbridge, New Jersey, on January
15       16, 2009, commencing at 8:50 a.m.
16
17
18
19
20
21
22
23
24
25
0002
1
2                A P P E A R A N C E S:
3
4        For the Plaintiff:
                 HAWKINS, STRACENER & GIBSON
5                BY:  Edward Gibson, Esq.
                 544 Main Street
6                Bay Saint Louis, MS 39520
                 E-mail:  egibson@hsglawfirm.net
7
8        For the Defendant:
                 MCGLINCHEY STAFFORD, PLLC
9                BY:  George "Dewey" Hembree, III, Esq.
                 City Centre South, Suite 1100
10               200 South Lamar Street
                 Jackson, MS 39201
11               E-mail:  ghembree@mcglinchey.com
12
13
14
15
16
17
18
19
20
21
22

                              Page 1

Alexander vs Countrywide Home (final).txt
```
 5          Q.   Mr. Petrucelli, if you would state
 6   your name for the record.
 7   A.     Joseph Petrucelli.
 8          Q.   And have you ever given a deposition
 9   before?
10   A.     Yes, I have.
11          Q.   How many times, approximately?
12   A.     Approximately I would say ten times or so.
13          Q.   So you're very familiar with this
14   process?
15   A.     Absolutely.
16          MR. HEMBREE:  Okay.  Would you like to
17          read and sign this deposition?
18          MR. GIBSON:  We would, we would like
19          to read and sign.  And we just would say
20          that deposition taken under federal rules
21          of Civil Procedure, standard stipulations
22          agreement filed, okay.  All objections,
23          except those as to form, are reserved for
24          later ruling.
25          MR. HEMBREE:  That's fine.
0006
 1          MR. GIBSON:  Okay.
 2          Q.   What is your present address?
 3   A.     Business address?
 4          Q.   Yes.
 5   A.     263 Main Street, Woodbridge, New Jersey,
 6   07095.
 7          Q.   What's your home address?
 8   A.     62 Revere Boulevard, Edison, New Jersey.
 9          Q.   What is your current occupation?
10   A.     My current occupation is I am a licensed
11   CPA, I also hold a New Jersey mortgage banking
12   license, so I actually bifurcate between two, one
13   in the mortgage and one in the accounting.
14          Q.   Tell me about your CPA business, what
15   sort of entity is it, is it a partnership,
16   corporation?
17   A.     It's a professional corporation.
18          Q.   Okay.  Are there any other
19   stockholders or shareholders other than yourself?
20   A.     Yes.
21          Q.   Who are they?
22   A.     Tim Piotrowski is a shareholder, an equity
23   shareholder; and Kevin Duffy is a partner, but
24   he's not in an equity position.
25          Q.   Okay.  Regarding the mortgage broker
0007
 1   business that you mentioned, how many employees
 2   does that business have?
 3   A.     That fluctuates up and down.  When we have
 4   a lot of salespeople it could be as high as 40 to
 5   50.  In the down times it's, you know, ten.
 6          Q.   Okay.  Approximately how many
 7   employees do you have at this time?
 8   A.     In between here I would say probably about
 9   15 active employees at this time.
10          Q.   And where is that business located, is
11   it here in New Jersey?
12   A.     This is considered a branch, one of the
13   branches.  The actual main office is in Keyport
14   on 35 Broad Street.
15          Q.   Is that New Jersey?
```
                                        Page 3

                    Alexander vs Countrywide Home (final).txt
16   A.    Yes, it is.
17         Q.   Okay.  Are you a principal in the
18   mortgage broker business?
19   A.    No, I am not, I am the executive
20   vice-president of that.
21         Q.   Okay.  What sort of organization is
22   that, is it a corporation?
23   A.    It's a corporation.
24         Q.   Who are the stockholders of that
25   corporation?
0008
1    A.    Ed Kenmure, Junior is the sole shareholder.
2          Q.   Are you a licensed mortgage broker?
3    A.    I'm a licensed mortgage banker.
4          Q.   Banker, okay.  When did you obtain
5    that license?
6    A.    That should have been in 2004, I actually
7    obtained my own license.
8          Q.   Explain that for me.
9    A.    That -- I had been working in the industry
10   under my other -- I was part of another
11   organization where I was a shareholder, and there
12   was no need for me to have my license at that
13   time.  When we were -- when I saw that we were
14   going to be separating because of the direction
15   the company was going, which was a different
16   direction than I would have liked to have gone, I
17   went out and took the test and passed the exam
18   and secured my own license.
19         Q.   And what state does that license
20   originate from?
21   A.    New Jersey.
22         Q.   Who is the issuing authority for that
23   license?
24   A.    The Department of Banking and Insurance.
25         Q.   Tell me about your educational
0009
1    background?
2    A.    Can you be more specific, because I have a
3    pretty extensive educational background.  Would
4    you like me to go in -- what direction would you
5    like it to go?  You could refer to page nine and
6    ten of my report which would spell it out and I
7    think might save some time.  But if you want to
8    be more specific I would be more than happy to
9    clarify anything on page nine and ten.
10         Q.   Okay.  Where did you attend
11   undergraduate college?
12   A.    Kean College.
13         Q.   Okay, where is that?
14   A.    In Union, New Jersey.
15         Q.   Okay.  What type of institution is
16   Kean College?
17   A.    State college.
18         Q.   Okay.  Is it a commuter college?
19   A.    It's both commuter and stay.
20         Q.   Okay.  Approximately how many students
21   when you were there?
22   A.    I wouldn't even venture to guess, I
23   wouldn't know that.
24         Q.   What was your major?
25   A.    I started out as an economic major and it
0010
                          Page 4

Alexander vs Countrywide Home (final).txt
1   led to a concentration in accounting.  So I would
2   say I'm an economic major graduate with a
3   concentration in accounting, which gave me the
4   ability to sit for the CPA exam.
5        Q.   Okay.  And I take it you did sit for
6   the CPA?
7   A.   Yes, I did, sir.
8        Q.   Okay.  After undergraduate did you
9   have any other graduate schooling experience?
10  A.   I've taken various courses at different
11  schools, I never completed my graduate, the focus
12  was mostly in taxation.
13       Q.   Okay.
14  A.   But I did not complete it.  But I have many
15  certifications.
16       Q.   Okay.  Before we get to the
17  certifications, what other courses have you
18  taken?
19  A.   It would be too extensive to discuss.  But
20  when you go to the banking seminars there's
21  banking seminar courses, when you go to
22  accounting seminars.  So, you know, pretty much
23  we would go to, like, a HUD seminar which would
24  give us a lot of oversight onto the HUD
25  regulations, VA regulations, so it's a pretty
0011
1   broad range.  But when you tend to have a license
2   you tend to have to stay on top of the
3   regulations more so than the person that's not
4   licensed.
5        Q.   Okay.  So you're referring to seminars
6   associated with your professional activities?
7   A.   Right.
8        Q.   When I asked regarding courses I meant
9   any college graduate level courses beyond
10  undergraduate have you taken?
11  A.   No, but I currently teach as a professor in
12  a college accounting taxation for the College of
13  Staten Island.
14       Q.   Okay.
15  A.   As an adjunct professor.
16       Q.   And is that located in Staten Island,
17  New York?
18  A.   Staten Island, New York.
19       Q.   Okay.  And how long have you been
20  teaching there?
21  A.   Two years.
22       Q.   And what is the nature of your course?
23  A.   Taxation, accounting.
24       Q.   Okay.  After you -- well, when did you
25  obtain your CPA license?
0012
1   A.   I believe it was 1985.
2        Q.   Okay.  And did you immediately go into
3   the accounting practice at that time?
4   A.   Yes, I did.
5        Q.   Okay.  Earlier you mentioned that you
6   had also been in a banking type of business of
7   some sort or mortgage business?
8   A.   Yes.
9        Q.   Okay, tell me about that.  Was this
10  right after -- excuse me for interrupting you.
11  A.   No problem.
                         Page 5

Alexander vs Countrywide Home (final).txt
12         Q.    Would this have been while you were
13    still practicing as a CPA?
14    A.     It was pretty interesting, when I became a
15    CPA one of the large servicer's back then was a
16    company by the name of Larsen Mortgage, so I had
17    on the accounting side been in mortgaging from an
18    accounting perspective and seeing how it operated
19    from an accounting side, and I just had to
20    network.
21         I believe it was in 1995 the opportunity
22    came to become part of a small mortgage banking
23    operation in Jersey City by the name of Security
24    Atlantic Mortgage.  And I helped build that
25    company into a pretty successfully sizable lender
0013
1    in New Jersey.
2         And we separated, I believe it was roughly
3    in 2003 or four when I got my banking license,
4    because they became a large wholesale lender, and
5    at that time I was doing a lot of retail lending.
6    And although I had been involved in the wholesale
7    side and the issues of compliance and all that
8    stuff I was more focused on the retail.  So
9    that's when I went and became associated with the
10    United Community Mortgage.
11         Q.    Okay.  Beginning in 1995 and during
12    your time at the company what were your
13    responsibilities and duties?
14    A.     Pretty much I was directly responsible for
15    getting us our HUD endorsements, meaning that we
16    could directly write for HUD, VA loans.  I'm also
17    a direct endorsed underwriter, which means I'm
18    approved to underwrite and approve a file for
19    HUD.
20         So basically I was in charge of the
21    operations and involved in pretty much the
22    oversight of the closing and the origination, so
23    more the quality control, the technical side,
24    making sure that we were complying with RESPA,
25    TIL and all of the other things that would
0014
1    prevent us, you know, so hopefully not put us in
2    a position that we were not in compliance.
3         Q.    You just used some acronyms RESPA,
4    what does RESPA stand for?
5    A.     The residential -- I'm sorry, the real
6    estate -- you know, we call it RESPA so much, I'd
7    have to look at the exact definition what it is,
8    because I'm so spoiled on calling it RESPA.  If
9    you give me a few minutes I'll remember the
10    acronym of what it stands for, but it hasn't
11    really been asked of me.  Real estate -- real
12    estate procedure act, I can't think what the S
13    stands for right now, but it will come to me.
14         Q.    And I believe the other term you
15    mentioned was TIL?
16    A.     Truth In Lending.
17         Q.    Okay.
18    A.     That I can be more clear on because it's
19    more frequently used.  RESPA's more when we close
20    with the HUD-1's.  Real Estate Settlement
21    Procedure Act.
22         Q.    Okay.  You mentioned that you had
Page 6

                    Alexander vs Countrywide Home (final).txt
23    received a designation by HUD?
24    A.    Yeah.
25          Q.    How was that obtained?
0015
1     A.    You have to demonstrate the proficiency in
2     order to underwrite under HUD guidelines.  The
3     fortunate thing is HUD pretty much spells out
4     what those guidelines are, so you basically have
5     to go through case studies and present case
6     studies to HUD, and then they release you as what
7     they call a direct, you know, direct endorsed so
8     that you do not have to go to lender, you know,
9     another lender or anybody, you're actually able
10    to approve the loan.
11          Back then it was much more manual, today
12    it's much more technological where you can
13    actually put it into a system called LP and can
14    get what they call an LP accept, you know, loan
15    prospector.  And, you know, at that point HUD
16    will give you the reps and warranties because of
17    that electronic approval.  So it kind of took
18    some of the pressure from the credit side.  But
19    there's still a lot of manual underwriting that
20    still gets done.
21          Q.    Okay.  After you separated from the
22    company did you form your own company at that
23    time?
24    A.    No, I'm part of United Community Mortgage.
25          Q.    Okay, tell me about that, what type of
0016
1     business did you start?
2     A.    It's a combination, it was pretty much
3     retail but it's becoming also a retail wholesale
4     operation.  But given the economic times the
5     mortgage industry has not been a big originating
6     process, so it was fortunate that we have the
7     accounting to sustain ourselves, because the
8     mortgage side of the business origination side of
9     the business is slow right now, it's been slow
10    for the last couple of years.
11          Q.    Okay.  I take it during all this time
12    you were in these two lending businesses you were
13    still practicing accounting?
14    A.    Yes.
15          Q.    Approximately how was your time
16    divided between these two?
17    A.    Back then it was probably 95 percent in the
18    mortgage industry and very limited in the
19    accounting.  When we were busy in the mortgage
20    industry there was no time to do it.  It was when
21    we saw the economy start to change we saw the
22    lending, you know, availability of products
23    starting to change.  And I extremely became
24    concerned when they were doing the 100 percent
25    programs for the alternate credit.  As an
0017
1     underwriter I was very cautioned, and I
2     personally fell off tremendously when they
3     started doing those products because I wasn't
4     comfortable putting people in those products.
5           Q.    What is a valuation analyst?
6     A.    A valuation analyst is someone that takes a
7     business, prepares a valuation, it could be for a
                              Page 7

Alexander vs Countrywide Home (final).txt

8   various assortment of things, anywhere from
9   damages in a divorce situation where we're trying
10  to assess both sides or injury.  But it's an
11  extensive valuation that requires training, um,
12  it's, you know, you're dealing with looking at
13  the economics, you're looking at the industry,
14  it's specific industries, its, you know, it's not
15  broad ranged.
16       So it's basically like an appraiser, but a
17  much higher level because you're doing the actual
18  verification and trying to gather as much data as
19  you can to support it.  They usually wined up in,
20  like, the size of a book with all of the
21  compliance and technical stuff.
22       Q.    Is there any entity or body that
23  certifies a valuation analyst?
24  A.    NACVA.
25       Q.    What does that stand for?
0018
1   A.    National -- you know what, I'd have to look
2   it up to be honest with you.  I'm certified --
3   I'm in the process of finishing my certification,
4   I'm almost through it.  If you really want to
5   have it I have it on my desk as we speak.  But I
6   call it NACVA so much, it's something valuation,
7   appraisal valuations, so forth, but I'll get it
8   for you.  Because it's similar to the ACA and
9   there's so many different acronyms, but I'll get
10  it for you.
11       Q.    Okay.  So I take it you're not
12  certified at this time?
13  A.    No, what I did is I passed the exam,
14  there's a written exam and there's a report that
15  is required.  As a CPA I don't have to have it, I
16  can still do business valuation, but it's a
17  credential that has specific guidelines.  And I'm
18  a very guideline person, and a procedural person,
19  so they kind of, like, guide you as to the proper
20  way to write the report, the proper procedures
21  and so forth.
22       Q.    Okay.  Have you ever taught any
23  courses related to lending, mortgage lending?
24  A.    Have I taught any courses related?  I've
25  been asked as a guest speaker and have spoken at
0019
1   the convention on the 203K loan product, which is
2   the rehabilitation product.  So I have spoke on
3   it.
4        Have I taught?  Yeah, because all the loan
5   officers in my day that have come through I teach
6   them compliance, I teach them how to take a loan
7   application, I teach them what they, you know,
8   what APR stands for, the annual percentage rate
9   and various things they need to know to keep them
10  compliant.
11       So, yes, as a manager of a mortgage company
12  that had residential loan officers coming through
13  we would have sales meetings frequently, teaching
14  them products like Countrywide and what type of
15  loan products to do, what you have to do in order
16  to meet those requirements in order to get the
17  person approved for those types of loans.  So my
18  answer would have to be yes.

Alexander vs Countrywide Home (final).txt

19      Q.    And I guess you misunderstood my
20  question.  I meant have you taught at a college
21  or school regarding any mortgage lending courses?
22  A.    Not at a college or a school.
23      Q.    Okay.  Have you ever taught any
24  classes at a college or school regarding
25  servicing of loans?
0020
1   A.    No.
2       Q.    Okay.  What experience have you had
3   servicing loans?
4   A.    I gave you the example of many years ago
5   Larsen was a servicer, so when you do the audit I
6   understood what they had to do.  Matter of fact
7   I'd have to sit at a computer back in those days
8   with those old dot matrix printers hammering away
9   and go through, and every fifth one I would have
10  to pick out and so forth and test it.
11      So I understand how they derive their
12  revenue, I understand how they operate.  And it's
13  ironic because I did it very early on in my
14  accounting career.
15      And in the mortgage side I learned how what
16  we get paid, which there's different levels of
17  how we get paid.  There's the servicing release
18  value built into a premium and so forth as a
19  lender.  So and I understand it from having done
20  it and seen it in operation, I understand it
21  having been involved in an audit of it.
22      So to go have -- can I say I went through a
23  school?  No, I did not go to a school that
24  directly -- and I'm not aware of a school that
25  directly teaches servicer's.  And I'm aware of
0021
1   various courses, I think you can go for your M --
2   you know, your masters in mortgage banking.  But
3   I believe they have a whole book and seminar,
4   I've seen the book and I've known people that
5   have taken it.  But I'm not aware of a school,
6   but maybe somebody that I've come across might
7   have.
8       Q.    Have you ever been employed by a
9   mortgage servicer?
10  A.    The last company I was associated with was
11  venturing into it, but I haven't been employed
12  specifically as a servicer, no.
13      Q.    Okay.  And I guess just for the record
14  if you could, just tell me your definition of
15  what a mortgage servicer is?
16  A.    My definition of a mortgage servicer?
17  There is -- basically there is, you know, there's
18  companies that are more efficient at collecting,
19  servicing the premiums.  And lenders have found
20  that they can get it done less costly by going
21  and outsourcing the service than they can do it
22  in-house, because maybe they want to concentrate
23  more on the origination.  Because as we know in
24  the lending process there's multi facets to the
25  lending process, there's the origination, there's
0022
1   the secondary market, I mean, there's all
2   different layers from the lending.
3       So from my definition would be it would be
                    Page 9

Alexander vs Countrywide Home (final).txt

0027
1   A.    Yeah, you asked me about the origination.
2         Q.    Right.    What I really want to know is
3   about your experience in dealing with the various
4   regulations that have been adopted by the
5   Veterans Administration?
6   A.    Well, like I said, having done, you know,
7   we've closed many VA loans, so we had to know the
8   regulations and, you know, they have a whole book
9   on it and you go through their books.  And, you
10  know, there's the qualifying part of it, there's
11  the closing part.  They're very procedural, their
12  deed of trust.
13        Everything they have you have to have your
14  -- you have to take your system, like we use
15  Contour, which now is has changed, but we would
16  have to tailor our forms taking the VA language,
17  because VA would have specific language for
18  specific things.  So you'd have to say your
19  successors and ours signed by the Department of
20  Veterans, and you would change all your
21  documentation.
22        So you would have to do an extensive review
23  of the regulations and put the necessary forms so
24  that you would be able to give your originators
25  the documents that they were taking out to the
0028
1   public.
2         And we would actually send our documents to
3   legal people to make sure we're in compliance.
4   Because if you violate TIL, or Truth In Lending
5   by greater than $100 you could have your whole
6   transaction overturned.  So we're very sensitive
7   to that.
8         And the VA, you're doing 100 percent
9   financing.  So the VA guaranty, from our
10  perspective, when we're on the hook as the
11  lender, because we're the originating lender, if
12  we didn't do our documentation properly we could
13  potentially lose our guaranty, which would be,
14  you know, which would mean that we would then be
15  liable.
16        So from a regulatory perspective you'd have
17  to really go through the regulations and tailor
18  your origination package, your closing documents
19  and everything else.
20        And back then we didn't have the DocMagic's
21  we do today and the sophistication we do today,
22  back then you were doing those documents.  Back
23  in the 90's and mid 90's was just when we started
24  to get onto the more technological group.  So you
25  were much more -- you sent your documents out to
0029
1   a printer, and then those old documents would
2   come back and you would proofread those
3   documents.
4         So I was in the part of it before we had
5   the boom, like to say, and the technology we do
6   today.  But I would say I've reviewed those
7   documents many, many times.
8         Q.    Okay.  You mentioned that you as a
9   lender if the VA guaranty is lost what happens to
10  the lender, the lender has to assume the loan?
                            Page 12

Alexander vs Countrywide Home (final).txt
```
11  A.    The lender is responsible.  The VA, it's
12  like anything else, even the F-- we all know what
13  mortgage insurance is like, so I don't have to
14  explain it to both of you what mortgage insurance
15  is.  The VA is a mortgage insurance, in my mind,
16  it's like to ensure the fact that this is a loan
17  that has no equity in the property.  Just like
18  FHA is doing 97 percent, so the equity is three.
19  Those are your insurances.  And if you don't meet
20  the requirements of those insurances you
21  jeopardize that insurance, as many of us have
22  learned about collateralized debt obligations,
23  so...
24       Q.    Okay.  You mentioned that there were
25  certain books that you would refer to from the
0030
1   VA, what books would you refer to?
2   A.    I'd have to go to, I mean, to get to the
3   specific.  But, you know, there's pamphlets,
4   there's constant things that are available, they
5   have information on the internet.  So there's
6   different regulations, they spell out everything,
7   like I said.  I mean, I'd have to go and get the
8   book, but there's a VA guideline and manual book.
9        Q.    Okay.  Have you taken any special
10  courses regarding VA regulations?
11  A.    You know, back then in those days we would
12  have been in such contact with the VA we actually
13  went into the VA and they would actually train
14  you in those days, you would actually go to
15  Newark, just like you would with HUD, and you
16  would actually meet certain people in the VA and
17  they would, you know, back then because you're a
18  lender there's a different level, but they let
19  you inside the VA and you meet the VA
20  underwriters, and you constantly have resources
21  through them.  And, you know, whenever you would
22  get stuck you could call up, like them, and they
23  would guide you.
24       So back then it was, you know, pretty much
25  hands-on.  I believe it is that way today.  Now
0031
1   they call them homeownership centers.  Back then
2   it was more like you went into someone's office
3   and it was two or three people.  But you
4   definitely had a close relationship.
5        When you get your ability to do the VA's as
6   a lender you're sent a package, they interview
7   you, you know, as part of that process with
8   Security Atlantic back in those days.
9        Q.    Okay.  When was the last VA training
10  course you attended?
11  A.    The last VA training course?
12       Q.    Uh-huh.
13  A.    I have not taken a training course in a
14  while.
15       Q.    Okay.
16  A.    I tend to have been -- we have
17  underwriters, so I became more in a management
18  role, so I kind of became less involved in the
19  actual underwriting of the VA loans.
20       Q.    Okay.  You mentioned that you went to
21  Newark for training, when did you go to Newark
```
Page 13

Alexander vs Countrywide Home (final).txt

22  for training?
23  A.    It's been too long for me, I wouldn't even
24  venture to guess, but it was a while ago, it was
25  in the 90's, so it was a while ago, so it was a
0032
1   while.
2         Q.    Would that have been the last time you
3   went for any training on the regulations?
4   A.    Yes.
5         Q.    Okay.  You mentioned in your report,
6   and I'm going to get to your report in just a
7   minute.
8   A.    Okay.
9         Q.    But you mention in your report that
10  the Truth In Lending regulations might have some
11  sort of impact on the Alexanders' claims in this
12  case.  How does the Truth In Lending Act relate
13  to the claims made by the Alexanders in this
14  case?
15  A.    Because the Truth In Lending dictates a lot
16  of the line items and the regulatory
17  requirements.  So you look at the document you
18  can see how it sets up the whole loan and the
19  whole format of the loan.
20        Q.    Okay.  And that's in the origination
21  process?
22  A.    It's also in the closing process.
23        Q.    Okay, and the closing process.  But
24  now Countrywide did not originate the loan for
25  the Alexanders, did it?
0033
1   A.    No.
2         Q.    And Countrywide did not close the loan
3   for the Alexanders, did it?
4   A.    No.
5         Q.    So the Truth In Lending Act couldn't
6   relate to any claims against Countrywide in this
7   case, could it?
8   A.    Yes, because once they become the servicer
9   they take on all of the responsibilities of the
10  lender.  So I'm confused.  I'm not understanding
11  your question.
12        Q.    I don't think I understood that
13  statement.  Okay.  Countrywide when they become
14  the servicer for the loan take on duties related
15  to the origination of the loan?
16  A.    The VA specifically requires the servicer
17  to represent the VA and all of the -- represent
18  warranties of the VA.  So, yeah, I would say they
19  actually become to a level of a lender, except
20  that I think their commun -- there's all kinds of
21  communications.
22        Again, I had asked for the servicing
23  agreements that they signed, because Countrywide
24  would have had to sign a servicing agreement with
25  the VA, so that would spell out pretty much all
0034
1   of the details.  So I think we would be better
2   served having that servicing agreement than me
3   answering it, because that would spell out
4   whether or not the TIL.  But certainly the TIL
5   setup the escrow requirement and the fact that
6   there was insurances required and the payment and

Page 14

Alexander vs Countrywide Home (final).txt
7   the amounts and all of the other documentation.
8   So RESPA also, you know, has procedures for
9   escrow, I mean.
10          So yielding to the fact that we don't have
11  the actual servicing signed agreement, you know,
12  I'm not sure we would conclusively come to a
13  conclusion.  We could argue differently, but I
14  would think the servicing agreement would spell
15  it out.  It tells everything you have to do back
16  and forth.  So to answer your question, I mean,
17  that would be a debatable, we mainly would be
18  debating for quite a while if we went that path.
19          Q.   Okay.  So I take it as we sit here
20  today then you don't know who originated this
21  loan for the Alexanders?
22  A.    Um, do I know who originated the loan?  I
23  was never asked to, so I would say, you know, no.
24          Q.   Okay.  Do you know who the holder of
25  this loan is, as we sit here today, of the
0035
1   Alexanders?
2   A.    Do I know who the holder of the loan is,
3   no.
4           Q.   Okay.
5   A.    I don't even know who owns the property.
6           Q.   Okay.  And I believe you just
7   testified you've not seen any servicing
8   agreements related to the Alexanders?
9   A.    No, I have not.
10          Q.   So since you've not seen any
11  agreements, just to follow it up, you don't have
12  any personal knowledge regarding the relationship
13  between Countrywide and any other entity involved
14  in the Alexanders' loans?
15  A.    I apologize, can you just say it a little
16  slower and clearer, I apologize.
17          Q.   Since you've not seen the servicing
18  agreement involved in the Alexanders' loan you
19  have no personal knowledge regarding the
20  relationship between Countrywide and any other
21  entity involved in the Alexanders' loan?
22  A.    That is a correct statement.
23          Q.   Okay.  And I guess I just used a term
24  that I probably should get you to define.  I used
25  the term holder, do you know what the term holder
0036
1   means?
2   A.    Yeah, the person that is responsible -- I
3   mean, the person that actually holds the right to
4   that note or that mortgage.  So in our
5   environment today I don't know who the holder is
6   on many loans anymore, and I don't think you will
7   either.
8           I am not even sure -- in this case we know
9   the veterans are the ones that are guaranteeing
10  it and it's a Ginnie Mae security or a government
11  backed security that ultimately secures the loan.
12  So you can take that holder a whole different
13  way.
14          But from my perspective the holder would be
15  the person that has the right to collect that
16  money and derive the benefit from that mortgage
17  or that security that was created.
                          Page 15

Alexander vs Countrywide Home (final).txt
```
18      Q.   Okay.  And typically there is a
19 servicing agreement between a servicing agent and
20 the holder, correct?
21 A.    I don't know it to be any other way.
22      Q.   So that's correct?
23 A.    That is correct.
24      Q.   Okay.
25 A.    Absolutely.  How else would you get paid?
0037
1       Q.   In your report that you prepared for
2 this case you mentioned an entity by the name of
3 Countrywide Bank.
4 A.    Uh-huh.
5       Q.   Was it Countrywide Bank NA or
6 Countrywide Bank FSB, or what was the actual
7 term?
8           MR. GIBSON:  What page are you
9 referring to?
10      Q.   I tell you what, why don't we go
11 ahead.
12          (Exhibit 1 was marked for ID.)
13          (A short break was taken.)
14      Q.   Before the break I was about to hand
15 you what's been marked as Exhibit 1, which I
16 believe is a copy of your report, is it not?
17 A.    Yes.
18      Q.   On page one of the report, the first
19 sentence, Countrywide Home Loans, Inc. is a
20 division of Countrywide Bank.
21 A.    Yeah, Countrywide from all of the
22 correspondence we received as we were a
23 correspondent lender, United Community Bank, so
24 they're always talking about all of their
25 subdivisions and that they became a bank and they
0038
1 have subdivision for insurance, they have
2 subdivision for servicing.
3       So I believe I'm talking about the whole
4 entity that became Countrywide Bank.  Because we
5 constantly get, you know, like as somebody that
6 sells -- we sell loans to Countrywide through
7 United Community, or we did, and I'm assuming the
8 whole big broad, and again I don't have the
9 entity structure in front of me.  And from my
10 perspective it's Countrywide, the big guy, with
11 all these divisions underneath it.
12      Q.   So you've not consulted any
13 documentation or official publications to support
14 that first sentence?
15 A.    Based on my experience and all of the
16 documentation and fliers and e-mails that we get
17 from Countrywide that would be my basis for it.
18 I mean, I believe they advertise it on their
19 websites too, Countrywide Bank.
20      Q.   Okay.
21 A.    I think even now they still speak to
22 themselves as Countrywide Bank.
23      Q.   And who is they?
24 A.    Countrywide.  I mean, I'm pretty sure they
25 advertise.  I mean, the literature I get from
0039
1 them on my own mortgage says Countrywide Bank.
2 So I'm not sure of the question.
```
                                Page 16

Alexander vs Countrywide Home (final).txt

```
 3        Q.   Okay.
 4             (Exhibit 2 was marked for ID.)
 5        Q.   I'd like to hand you what's been
 6   marked as Exhibit 2, which is the corporate
 7   disclosure form filed by Countrywide in this
 8   case.
 9   A.   Okay.
10        Q.   And I just note for you that
11   Mississippi requires all corporations involved in
12   litigation to file exhibits such as Exhibit 2.
13   And that document states that Countrywide Home
14   Loans, Inc. is a subsidiary of Countrywide
15   Financial Corporation.  Do you see that?
16   A.   Correct.
17        Q.   And that Countrywide Financial
18   Corporation is a publicly traded company.
19   A.   Okay.
20        Q.   Okay.  Do you dispute the authenticity
21   of exhibit number two?
22   A.   No.
23        Q.
24   A.   Also, can I make a statement, Counselor?
25        Q.   Certainly.
0040
 1   A.   Is it okay?  This is a document, but this
 2   is not necessarily the way this lender advertises
 3   itself to the lending community.  This is a
 4   document, many companies sometimes will have
 5   Countrywide Home Loan, Inc. owned by Countrywide
 6   Financial Corp.
 7             But I can tell you clearly then my concern
 8   would be from a regulatory requirement the
 9   perception that is portrayed to the lending
10   community that is his Countrywide the bank, you
11   know, the big lender from soliciting our business
12   and trying to get us to sell them loans.
13             So where I look at it as a disclosure
14   statement and from a perspective, this is clearly
15   not the way it's perceived from my experience in
16   dealing with Countrywide.  You know, this is a
17   document that speaks to the actual format of a
18   corporate entity.
19             But the way your representatives and your
20   solicitor's approach us as a lender is this is
21   Countrywide Bank with all these abilities.  And
22   from enabling you to do credit reports, from
23   enabling you to do flood search, from enabling
24   you to do appraisals, from enabling you to do
25   servicing.
0041
 1             So in my opinion, and from what I gather
 2   from the documentation that I've been approached,
 3   that's why I come to that conclusion, is that
 4   they do have a big overall blanket of lending.
 5             So I see your document and I'll stipulate
 6   to the fact that it's Countrywide Home Loan, Inc.
 7   which is owned by Countrywide Financial
 8   Corporation.  So for that perspective I would
 9   say.
10             But I just wanted to give you my rationale
11   as to how we formulate opinion.  Because I've had
12   experience dealing with Countrywide as a
13   correspondent, as a broker through many years.
```

Alexander vs Countrywide Home (final).txt
14        I even actually trained at a Countrywide
15   facility to become when you first rolled out your
16   electronic underwriting platform in Pittsburgh I
17   was invited and trained by Countrywide staff.
18   So, you know, that's my rationale.  So I clearly
19   stipulate to your document.
20        Q.   Okay.
21        MR. GIBSON:  The Alexanders do not
22   though, I am not sure that there is ever a
23   dispute, but we're not going to stipulate
24   to that actually, just for the record.
25        Q.   You mentioned you were trained by
0042
 1   Countrywide, I take it these were underwriting
 2   training courses?
 3   A.    No, it's actually that you were rolling out
 4   your Platinum it's called, like Countrywide took
 5   loan prospector, which was Freddie and Fannie's
 6   version of the automated underwriting system and
 7   developed their own system called Platinum.  And
 8   you had to go meet with Countrywide
 9   representatives, and you trained in a class, you
10   get flown into Pittsburgh, and you actually have
11   to go through the underwriting system, they take
12   you screen by screen.  They tell you what the
13   things mean and what the representations.  They
14   tell you how you're going to close it and so
15   forth.  And at that time they were telling us how
16   we could use, I can't think of the name of your
17   appraisal company, but there was an appraisal
18   company, and if you used that appraisal company
19   you wouldn't be subject to a review.  If you used
20   their credit agency you would be able to pull
21   that credit into your report.
22        So it's much more than just underwriting
23   training, it was procedural, it was almost like
24   as if you were an extension of Countrywide, you
25   were partnered with them in these loans.
0043
 1        Q.   Okay.  Now you mentioned earlier in
 2   your discussion of the bank versus the corporate
 3   disclosure the word regulation.  Now, doesn't the
 4   status of a particular lending institution as a
 5   bank versus a mortgage lender affect the
 6   regulation and who the regulatory body is for
 7   those organizations?
 8   A.    It absolutely does.  Federal reg supersedes
 9   state.  So federally charted banks don't have to
10   actually follow some of the state regs.  Um, so
11   your statement is actually there's OCC, there's
12   OTS, there's FDIC, there's state banking
13   authorities.
14        So absolutely, if you're a federally
15   charted bank you're subject to one group.  The
16   state has this -- you know, like we're licensed
17   in the State of New Jersey, we're subject to the
18   New Jersey State Banking Regulations.
19   Countrywide federal -- if Countrywide Bank or
20   Countrywide Mortgage if they're federally
21   charted their subject to a different set of
22   regulations.
23        I believe OCC is the one for banks, like
24   federally charted banks, OTS is mortgage, and
                        Page 18

Alexander vs Countrywide Home (final).txt
25   FDIC is obviously if you're holding funds and so
0044
1    forth.  So, yes, that's correct.
2        Q.   And I take it by our discussion here
3    this morning you have not verified which
4    regulatory bodies have oversight of Countrywide
5    Home Loans, Inc. in 2002?
6    A.    The only regulatory oversight I really
7    relied on heavily was the VA and the VA -- and
8    absent being provided the servicing agreement I
9    went and looked up the VA guidelines that I knew
10   about the servicing and I knew about the deed of
11   trust, so I used the regulatory I relied on the
12   most with the VA regulations.
13       Q.   Okay.  What do the -- what does the
14   FDIC have to do with any of the claims involved
15   in the Alexanders' case?
16   A.    Well the FDIC is the insurance, you know,
17   so again one of the things that I learned through
18   my experiences and I was involved in some banks
19   being setup is the regulatory oversight, like
20   when it pertains to the insurance, you know,
21   making sure you're following specific protocols,
22   they've got memorandum of, you know, operations
23   and different things that they come in.
24       So the FDIC can -- is involved in anything
25   to do with, you know, insurances, a lot of times
0045
1    making sure the insurances are involved, from my
2    opinion that's what I, you know.  But I'm not
3    sure specifically in this situation.  Again,
4    absent the servicing agreement I'm not sure.
5        Q.   Okay.  So you're not sure if the FDIC
6    had any involvement in the Countrywide loan
7    situation to the -- or excuse me the Veterans
8    Administration loan situation to the Alexanders?
9    A.    I'm not sure.
10       Q.   Okay.  How about the Office of Thrift
11   Supervision?
12   A.    Those are the ones that typically oversight
13   the mortgage, the mortgage side, the mortgage
14   institutions.
15       Q.   Do you know whether or not the Office
16   of Thrift Supervision regulated Countrywide Home
17   Loans, Inc. in 2002?
18   A.    No.
19       Q.   Okay.  What is the National Flood
20   Insurance Act?
21           MR. GIBSON:  Objection to form.  The
22       document speaks for itself.
23       Q.   What do you know about the National
24   Flood Insurance Act?
25   A.    I just know that's how people get flood
0046
1    insurance.
2        Q.   Okay.
3    A.    If it wasn't they wouldn't be able to get
4    flood insurance, that's the extent of it.
5        Q.   Okay.  Are you familiar with any of
6    the regulations regarding the National Flood
7    Insurance Act?
8            MR. GIBSON:  Objection to the form,
9        broad.
                            Page 19

Alexander vs Countrywide Home (final).txt

```
10  A.    No.
11        Q.    Okay.
12  A.    I'm not.
13        Q.    How did the National Flood Insurance
14  Act relate to the Alexanders' case?
15  A.    I'm not sure I understand the question.
16        Q.    Okay.  What do you believe that the
17  National Flood Insurance Act relates to the
18  Alexanders' case?
19  A.    Can you -- from the perspect -- more like
20  can you give me a perspective of how it relates,
21  I'm not sure?
22        Q.    That's my question.  How does the
23  National Flood Insurance Act relate to the
24  Alexanders' claims against Countrywide?
25        MR. GIBSON:  Objection to the form.
0047
1   A.    I'm not sure.  I don't know the National
2   Flood Insurance so I'm not, I mean --
3         Q.    Okay.
4   A.    I know that it enables people to get flood
5   insurance.  I also -- other than that it's
6   insurance.  I'm not holding myself out as having
7   to understand the insurance side of insurance.
8   So, I mean, I would not speak to the National
9   Flood Insurance, I'm not sure.
10        Other than I know that insurance companies
11  needed that body in order to issue flood
12  insurance, that's about the extent of flood
13  insurance I know.
14        Q.    Okay.
15  A.    So I'm not sure other than that.
16        Q.    Are you familiar with whether or not
17  the Veterans Administration Regulations
18  incorporate any of the provisions of the National
19  Flood Insurance Act?
20  A.    The VA has specific guidelines that when
21  something is deemed in a flood zone they have an
22  actual form they use.  So I'm not sure.  Again, I
23  don't pay attention to the flood insurance -- the
24  National Flood Insurance as a lender.  I'm more
25  concerned with making sure I close a loan
0048
1   properly that if flood insurance is required that
2   we escrow for it and provide for it.
3         Q.    Okay.
4   A.    As far as the National Flood Insurance
5   impacting it, I know the VA requires it.  I know
6   depending on -- I can tell you firsthand the
7   premiums are affected by whatever level of impact
8   the flood can have on you.  I mean, you can have
9   premiums from $100 to $4,000.
10        And it's very common in New Jersey, because
11  we have a lot of coastal properties, so if you're
12  on a beach people pay $4,000 for flood insurance.
13        And I told Counsel some of the experience
14  is amazing, like you think a property is not in a
15  flood zone and they're paying flood insurance.
16        So the only perspective that I see is that
17  VA requires it.  And if they require it you as a
18  lender are required to escrow for it.
19        I mean, but as far as the National Flood
20  Insurance Act, I'm not sure how it would play in,
```

Page 20

```
                    Alexander vs Countrywide Home (final).txt
21   it would typically not be something I would
22   concern myself with.
23        Q.   Okay.  So you're familiar with the
24   forms that you see at origination and closing
25   that the VA puts out?
0049
1    A.    I'm also familiar with the process --
2         Q.   I hate to interrupt you.
3    A.    Okay.
4         Q.   But if you could answer the question,
5    then I would be happy to let you explain.
6    A.    Okay.
7         Q.   Are you familiar with the forms that
8    the Veterans Administration issues for
9    originators and closers in connection with flood
10   matters?
11   A.    I'm familiar with it both from an
12   origination, I'm familiar with it both
13   processing, and I'm familiar with it both
14   closing.
15        Q.   Okay.
16   A.    I'm also familiar, you know, with it in
17   like how it's escrowed and stuff like in --
18   because people will frequently that we close will
19   come back to us with their escrow statement and
20   ask us, well you told us our payment was X, why
21   is it Y?  And we'll sit down and we'll analyze
22   those statements, because as required by RESPA
23   you're suppose to be getting one a year where
24   they reconcile it.
25        So frequently even though we sell the
0050
1    servicing as to a company like Countrywide, the
2    customer does see us as their contact and will
3    constantly come back to us and say, here's my
4    escrow statement can you explain it to me, we
5    called up and we don't understand it.  So, but I
6    understand it from the VA's perspective of the
7    forms to what I just explained previously.
8         Q.   Have you ever investigated the basis
9    for those forms that are issued by the Veterans
10   Administration?
11              MR. GIBSON:  Objection to the form,
12        basis.
13        Q.   Why the forms are there, have you ever
14   investigated as to why the VA forms are part of
15   the closing packages?
16   A.    Again, to give more clarity, more
17   disclosure, more openness, that's what's always
18   been explained to me by all these forms.
19        Q.   No, no, no, have you ever investigated
20   the basis for these forms yourself?
21   A.    I've spoken to the VA, I have spoken to HUD
22   when we get these forms, and I'm quite extensive
23   as to what's the purpose of the form, what's the
24   meaning behind the form.
25        We do investigate and try to understand the
0051
1    form, because sometimes they're not clear.  We
2    had the led paint disclosure.  When the led paint
3    disclosure came out we called up and we were
4    asking what does the form mean?  So we do contact
5    our agencies, because if a form changes or it's
                              Page 21
```

Alexander vs Countrywide Home (final).txt
```
 6    modified, like I explained to you, we're required
 7    as a lender to make sure we put those documents
 8    out the proper way.  We incorporate those forms
 9    and we now put our name on them.
10         So it may be a VA form, but we're accepting
11    responsibility, so we do tend to look at those
12    forms and try to understand them.
13         But the basis, again, if you're asking me
14    the basis from the insurance perspective, no.
15    But the basis from the regulatory compliance as a
16    lender's perspective I have.
17         Q.   Have you ever investigated the rules
18    and regulations that are behind the forms that
19    you've seen that have been put out by the
20    Veterans Administration?
21    A.   As it pertains to the flood, to flood
22    insurance?
23         Q.   Yes.
24    A.   The rules and regulations behind the flood,
25    no, I would not investigate the rules and
0052
 1    regulations behind the flood insurance.
 2         Q.   Okay, thank you.  What is your
 3    experience in dealing with mortgage clauses and
 4    insurance policies?
 5    A.   Extensive.  There's everybody has their own
 6    separate disclosure requirements, their own
 7    separate endorsements.  So if we close a VA loan
 8    it would be like lets say United Communities I
 9    can give you, it would be United Community
10    Mortgage, its successors and assigns as their
11    interest may appear for the Department of
12    Veterans Affairs or for the HUD, you know, HUD
13    and FHA.
14         So we're frequently again, because we have
15    to keep with -- we're actually closing as the
16    lender, and we're selling the transaction in a
17    secondary market transaction.  So in order for
18    that to become a marketable product to the second
19    person we have to make sure we have all those
20    assignments correctly, all those endorsements
21    correctly and so forth.
22         So when we would get an insurance policy we
23    would tell the person that you have to tell your
24    insurance person to put down United Community
25    Mortgage, Inc. it's successors and assigns as
0053
 1    their interest may appear.  If it was a HUD we
 2    have to say HUD; if it was VA we have to say VA.
 3    So, yes, I'm familiar with that perspective.
 4         Q.   And what is the purpose for a
 5    mortgagee clause in an insurance policy?
 6    A.   To make sure that they're protected, that
 7    they're named on the policy.  And it's like
 8    anything else, if you're not named on the policy
 9    as a named insurance, or you're not in any, you
10    know, involved in it they would know, you know,
11    you might not have insurance.  It's like a
12    contractor has an insurance policy, but if you
13    don't ask to be named as a named insured.
14         Q.   So it protects the lender?
15    A.   It protects the -- it protects the lender
16    and the consumer too, because the consumer, you
```

```
                Alexander vs Countrywide Home (final).txt
17  know, it protects the lender and the consumer.
18          Q.   The consumer is the insured, right?
19  A.   Right, so you have to say the consumer too.
20          Q.   Right.  What is your experience in
21  interpreting provisions in deeds of trust
22  regarding the treatment of insurance proceeds?
23  A.   Again, in VA it's spelled out, it gives you
24  examples of something was to happen how to apply
25  things.  It spells out the way, you know, it
0054
1   spells out how to apply, you know, advanced
2   payment, it kind of like spells out the whole
3   process, you know.  VA is pretty extensive on how
4   it spells out the proper application in a given
5   situation, so...
6           Q.   Have you ever been involved in that
7   process though, regarding the payment of
8   insurance proceeds?
9   A.   As a forensic accountant often.  And again
10  as a lender it's always like, you know, myself
11  and Tim will be frequently asked, because we have
12  a lot of defaults now.  So when we have a lot of
13  defaults and foreclosures and bankruptcies,
14  you're involved in, well, did they apply it
15  right?  Did they apply the payments right?
16          So, you know, we do frequently see it,
17  unfortunately.  It's not a good time, it's a
18  period of time where we're seeing more and more
19  how payments were applied, how they weren't
20  applied, more fees, you know, we're seeing fees.
21          We always know that the servicing fees, the
22  servicing fees you get paid are higher in a
23  default loan than when they're in a regular
24  operating loan.
25          So we're always asked, well, wait a minute,
0055
1   I only owe 100,000, why do I know owe 150?  You
2   know, so we are constantly going back and being
3   asked to look at that as accountants.  A because
4   we're an accountant and B because we as a
5   mortgage lender we understand the different
6   things that go into it.
7           So unfortunately in this time in the last
8   couple of years it's been more frequent than it
9   was years ago, because there's just more of these
10  situations.
11          And I would also like to think that because
12  taxes have been going up more and insurance costs
13  have been going up, ever since 9/11 the insurance
14  costs started rising, we're annually asked more
15  questions about escrow than I ever have in my
16  period of time as being involved in banking.
17          So we're more frequently asked to say is
18  this right, is this right?  We ask for the note,
19  we ask for the deed, we ask for all of the
20  information and we try to put together, you know,
21  how it's applied.
22          Q.   Okay.  And I guess that was my next
23  question, what documents do you look at to
24  determine how the proceeds are applied?
25  A.   Well again, the first thing obviously we do
0056
1   is we field them, any third source documents as
                          Page 23
```

Alexander vs Countrywide Home (final).txt
2  you know as accounting we like.  Because once
3  it's a third source documents we, you know, it's
4  supposedly a dependent.  So we look to the third
5  source documents.
6       We look to the document that was created at
7  the inception that sets the parameter.  So it's
8  simple, if it's a 30-year note and the interest
9  rate is X.  It becomes more difficult when you
10  have these loans that adjust and, you know, you
11  have adjustments and so forth.
12       There's also if there's a default what fees
13  can be charged, like you'll know some states have
14  pre-penalty payments, some states don't have
15  pre-penalty payments.  So you have to look and
16  see how it's all spelled out in the documents.
17       Q.    Okay.  And those documents would be, I
18  take it, the note?
19  A.    The note, the mortgage, you know, the deed
20  of trust, you know, so.  And then, you know, then
21  you would look at, like, escrow statements.  And
22  then the way you would did it is you would take
23  your clients' checks, because we would always ask
24  for proof, because that always becomes a dispute,
25  and we would go through all that, so that would
0057
1  be typically our approach.
2       Q.   Who has the primary duty to provide
3  hazard, flood, wind and similar types of
4  insurance coverage on the real property in a
5  mortgage transaction?
6       MR. GIBSON:  Objection.
7  A.    Who?
8       MR. GIBSON:  You're talking about this
9       particular or in general?
10       Q.   In general?
11  A.    First of all there's a big misconception in
12  my mind to the perception of a lot of things in a
13  lending transaction.  The insurance is to benefit
14  the lender and the people that have the note.  An
15  appraisal is done for the lender.  It's really if
16  the consumer does the appraisal they think it's
17  for themselves, but all of these things are done
18  to make sure that that note or whatever that debt
19  is is secured and the collateral is protected.
20       So to answer your question, it's a
21  combination of multiple people.  Obviously the
22  person that's buying it wants to be protected in
23  case you want to be protected, God forbid, you
24  were to die or you lose your job, become
25  disabled.  You also want to be protected so that,
0058
1  God forbid, you had an event that was
2  catastrophic you would be able to, you know,
3  rebuild it or sustain it.  So it's a question
4  that has to be answered broadly, there's a lot of
5  responsibilities in it.
6       The lender obviously has the ultimate
7  responsibility, because it's his mortgage, he
8  wants to be protected.  Like, we have examples
9  now where as soon as you don't pay your taxes or
10  you don't pay your insurance the lenders are all
11  over you, that's why they require two months
12  advance and they monitor the escrows.
                    Page 24

Alexander_vs Countrywide Home (final).txt
13      The whole purpose of escrow, in my mind, is
14 that the lender has two months of reserves.  If
15 they see it go askew -- the reason they want --
16 they virtually will not let you not escrow
17 anymore, unless you really have significant
18 equity.  So they'll actually charge you more
19 money if you try to say I don't want you to
20 escrow.
21      And the theory behind it has been that by
22 monitoring it they can catch something not being
23 paid, like taxes, or insurances.  Because it's
24 critical to them for it to be maintained.
25      Because, you know, nobody ever thinks
0059
1 something is going to happen.  And fortunately
2 for me I had apartment insurance and my apartment
3 caught fire.  So, you know, so I think it's a
4 caution that it's for a lot of varying parties
5 that insurance and all these things are put in
6 place for.  So I'm not sure I can answer it any
7 one way.
8      Q.   Who has the primary duty to pay the
9 premiums for this type of insurance?
10 A.    Well --
11           MR. GIBSON:  Objection to the form.
12      Again, in general or this specific case?
13      Q.   In general?
14 A.    In general, you have obviously the owner
15 signs an agreement that he's going to put
16 insurance in place.  And so the primary person,
17 like you're signing a note to pay the mortgage,
18 so the primary person to pay it is the
19 individual.
20      But the lender's, again, escrowing it and
21 the theory especially with insurance, the reason
22 why they make you pay it a year in advance is
23 because they're collecting your payment for
24 12 months, so that when the annual renewal comes
25 up the insurance is there.  They don't let you
0060
1 wait all year for the insurance, they're taking
2 your 20 or your $30 every month so that at the
3 end of the year they can pay the insurance.  So
4 they don't even give you the latitude of saying,
5 hey, we're going to pay this, they build it into
6 your money in the form of an escrow.
7      And on an annual basis the design is that
8 has there been anything that changed from last
9 year to this year that we need to adjust so that
10 when we do the next 12 months.  And frequently
11 they'll tell you, do you want to pay this so we
12 can keep your payment, or do you want us to
13 adjust?  So they offer you different options.  So
14 but the ultimate person that's paying it is the
15 person that took the mortgage and the note.
16      Q.   Okay.  I'd like to turn now to the
17 report that you have there --
18 A.    Uh-huh.
19      Q.    -- in front of you as Exhibit 1.  In
20 general, tell me about the methodology you used
21 in preparing this report?
22 A.    The methodology in this report was to --
23 was they were specific -- we were specifically
                        Page 25

```
                    Alexander vs Countrywide Home (final).txt
24   asked specific questions.
25           Q.   Okay.
0061
 1   A.     So if you go to page two the methodology
 2   was to approach the whole report based on those
 3   six questions.
 4           Q.   Okay.  And who asked you those
 5   questions?
 6   A.     Those questions were formulated by us and
 7   then were asked is this where you want it?
 8   Because we're asked to say how much is this --
 9   how much do you want to budget, or how much is
10   this job going to cost the typical client?  How
11   much is this going to cost me?
12           So we try to go out, well, this is what
13   looks like, you know, the general area we're
14   going, are these the correct form of questions?
15   So, you know, you try to narrow the scope.
16   Because, you know, as you know I can write a
17   report that could be...  and so it was us that
18   would analyze the assignment and in doing an
19   engagement letter we would try to formulate it.
20           So it would be a combination of us and then
21   the client's representative telling us this is
22   where we would like you to stay.  Because if you
23   want this report it's going to cost you this much
24   money, and if you want this report it's going to
25   cost that much.
0062
 1           So we kind of always approach it that we
 2   say, well, what's the scope of the engagement?
 3   So these questions are a direct relationship to
 4   what the scope of what we were engaged to do.  So
 5   I can't say, if you're asking me these are our
 6   questions in the general broad of a scope
 7   narrowed down into six bullet points.
 8           Q.   Okay.  Who made the assignment to you?
 9   A.     Counsel.  Counsel, um, contacted us and
10   said, you know, I would be interested in
11   retaining you.  And obviously we discussed the
12   scope again.
13           Q.   Okay.  So the assignment was given to
14   you by Counsel for the Alexanders?
15   A.     Correct.
16           Q.   Okay.  And so your methodology then
17   was to take the assignment and review the items
18   requested?
19   A.     Yes.
20           Q.   Okay.  Is the assignment based on your
21   abilities as an accountant, or your experience in
22   the mortgage lending business, or both, or how
23   does your experience relate to the assignment?
24   A.     Well, I think fortunately for Counsel
25   you're not going to find too many of me.  I mean,
0063
 1   I'm a mortgage banker and a CPA, I don't know of
 2   many of us out there.  So I kind of fit two
 3   prongs of this approach.  You're asking for a
 4   number analysis, so I'm strong on the numbers
 5   side as an accountant.  But I've also been so
 6   involved in setting up a mortgage center, a
 7   banking center, a lending center where I've
 8   actually been involved from ground one all the
                                          Page 26
```

Alexander vs Countrywide Home (final).txt

9  way to quite a sizable lender in New Jersey, I
10  mean, it became one of the largest FHA lenders in
11  New Jersey.  I didn't stay with it, because it's
12  not the direction in my career path, but I laid
13  the foundation for that growth.
14      So I kind of understand and I've done VA
15  loans, I deal with many veterans, you know.  So
16  most lenders would tell you they would not want
17  to do a VA loan because of the amount of
18  paperwork involved in it.  That's pretty much in
19  the industry in New Jersey, oh, we don't want to
20  do FHA, we don't want to do VA because they're
21  too cumbersome.  Our approach is, you know,
22  somebody has to help to do these loans, so we
23  started doing these loans.
24      So I think Counsel saw an opportunity to
25  have someone that understands the regulatory side
0064
1  and also looks can understand the accounting
2  side.  So...
3      Q.   How many times have you testified as
4  an expert before today?
5  A.    Um, I have to qualify that.  Um, many of my
6  -- I'm also a forensic CPA, so many of the things
7  that I do lead to potential criminal complaints,
8  so, like, I tend not to have to testify too much,
9  if you get, you know.  But there's been numerous
10  -- I mean, I have -- I think I've provided you
11  quite a few times I've testified.  The exact
12  number I couldn't give it to you, because it
13  spans over a period of time.  But again, being a
14  forensic accountant we tend not to have to
15  testify too much, if you follow what I'm saying.
16      Q.   How many mortgage lending cases have
17  you testified in as an expert?
18  A.    well when I was over at Security Atlantic,
19  my first company, and we would get sued or we
20  would get brought in, I tended to be the person
21  that would handle those types of situations, like
22  on a foreclosure, or, you know, a default.  So
23  there's -- there was quite a few instances on the
24  Security Atlantic side that we'd have to go in in
25  lender-related matters where people would accuse,
0065
1  you know, accuse us that, you know, the appraisal
2  process wasn't done or their, you know, their
3  escrows are wrong.  So I -- we -- I tended to be
4  more involved as defendant.  So although I didn't
5  testify I was involved.
6      But there have been a couple of instances
7  where I have been asked but I haven't had to
8  formally go before, again because it wound up
9  being that I found something and they didn't
10  actually go forward.
11      But when I was a lender and even when we
12  get litigation in United Community the president
13  the first person he calls is me and asks me,
14  well, what are we going to do?  And the first
15  thing we do, we grab our Truth In Lending
16  documents and our RESPA's, and we make sure that
17  there's no compliance.  We immediately make sure
18  that we have the 4506 in the file to make sure
19  there's no fraud.  Because in our side if there's
Page 27

```
                  Alexander vs Countrywide Home (final).txt
 1   lender for the Alexanders, correct?
 2   A.     Correct.
 3          Q.   Okay.
 4   A.     Well again, I don't know that, because,
 5   again, from what I -- I haven't been privy to the
 6   actual who originated the loan.  I'm assuming it
 7   was a VA property because of the way it looks.
 8   But so based on the documents that are before me
 9   I would say I don't think so, so no.
10          Q.   Okay.
11   A.     But conclusively I don't have -- I never --
12   you know, I don't know, I don't know, I did not
13   see the originating application, if that's what
14   -- because I'm sure there had to be somebody that
15   filled out the originating application that
16   started the whole process.  So I don't -- I can't
17   answer that.  So I don't think Countrywide, based
18   on the documents that I've seen at this point.
19          Q.   Okay.  Now you said in the end of that
20   paragraph that Countrywide would likely be fined.
21   Who would fine Countrywide?
22   A.     Well, when the regulators come in on a
23   defaulted loan they look and see if the proper
24   insurances and proper protections of the
25   collateral were, they would come in the
0074
 1   regulatory body, depending what level, and they
 2   would be, you know, you would be in trouble if
 3   they found that you didn't have insurance on a
 4   collateral the regulatory.
 5          Again, it's all different levels.  So,
 6   again, when we make that statement would likely,
 7   it depends on what level, because it's not clear
 8   what level of body that this is governed by.
 9          Q.   Okay.
10   A.     So that's why we use the word likely.
11   Because I could tell you if they were a bank and
12   there were not proper insurance on it you would
13   have no question a regulator would smack you with
14   a fine.
15          Q.   Okay.
16   A.     So again, it's not having proper insurance
17   is one of the, like, the smacks, you get smacked
18   on the hands for big time.  And so based on my
19   experience I've seen it.
20          Q.   Okay.  So you're telling me you don't
21   know that Countrywide would be fined, and you
22   don't know by whom they would be fined?
23   A.     Right.  But I also stated would likely be
24   fined for not having proper insurance.  Would
25   likely, again, because of the fact that it's not
0075
 1   clear.  And today you provided a document that
 2   it's Home Loans, Financial Corp.
 3          Again, you don't have the licensing
 4   documents here, so I don't know what level of
 5   compliance that they're being held to.  As a bank
 6   the servicing, just because they're carved out of
 7   the servicing doesn't mean that all of the bank
 8   provisions don't apply to being as a servicer of
 9   a loan.
10          So I'm not sure, it depends on the
11   circumstances for each one.  But one of the
                          Page 31
```

Alexander vs Countrywide Home (final).txt
```
23          marked.
24    A.    I think it might have got copied in a bad
25    copy.
0078
 1                MR. HEMBREE:  Okay.  Do you have any
 2          objection to the witness just writing
 3          Exhibit D on the bottom of it?
 4                MR. GIBSON:  No, go ahead.
 5                THE WITNESS:  Exhibit D.
 6                Would you like me to tell what the
 7    document is?
 8          Q.    Yes.
 9    A.    It's a settlement statement, it's a HUD-1,
10    typically we refer to it as a HUD-1 closing
11    settlement statement.
12          Q.    Okay.  And who is the seller of the
13    property?
14    A.    Veterans Affairs.
15          Q.    Okay.  So this property was real
16    estate owned by the Veterans Affairs, right?
17    A.    Yeah, it looks like this was a property
18    that the Department of Veterans Affairs owned,
19    yes.
20          Q.    Okay.  So were you aware prior to
21    today that this was foreclosed property?
22    A.    No, I mean, I can tell by obviously the
23    Department of Veterans Affairs owned the property
24    as the seller.  So, yeah, the likelihood would
25    have been somebody probably -- this would
0079
 1    probably be one of their properties that they
 2    probably took back in a VA loan.
 3          Q.    Were you aware that Countrywide Home
 4    Loan Services, Inc. was servicing this REO
 5    property for the Veterans Administration before
 6    the Alexanders purchased it?  In other words,
 7    before the date on the HUD-1?
 8    A.    The prior owner?  The prior owner was
 9    serviced by Countrywide, is that my understanding
10    of what you just said?
11          Q.    The Veterans Administration is the
12    prior owner in this case, correct?
13    A.    Okay, okay, so the veterans -- so
14    Countrywide was servicing for the veterans
15    association prior to the Alexanders taking over
16    ownership of the property?
17          Q.    Yes, were you aware of that fact?
18    A.    No, I was not aware of that fact.
19          Q.    Okay.
20    A.    I know they're a big servicer of the VA,
21    but I didn't know in this particular instance.
22          Q.    Okay.  Were you aware that a flood
23    determination was performed on this property
24    while it was owned by the Veterans Administration
25    on October 10th, 2001?
0080
 1    A.    When you say flood certification, are you
 2    talking about just the standard flood cert?
 3          Q.    Yes?
 4    A.    Yes.  No, I was not a part of it.  I think
 5    yesterday somehow I got a document.
 6          Q.    Okay.
 7                MR. GIBSON:  Talking about the
                                        Page 33
```

Alexander vs Countrywide Home (final).txt

19  A.    Yes, I do, sir.
20        Q.    Okay.  Are you familiar with what
21  flood zone B means, the term flood zone B?
22  A.    Yeah, B would probably not require flood
23  insurance.
24        Q.    Okay.
25  A.    There's a chart you use, like it goes A all
0083
1  the way through, and then it goes B and C.  So my
2  recollection is B is an okay.  And I also did see
3  a B one other place, I think I saw it on an
4  appraisal.
5        Q.    Okay.
6  A.    When it first happened on the property.
7             MR. GIBSON:  And if we just let the
8             record reflect that Mr. Hembree is the one
9             that identified the line item of Exhibit 3.
10        Q.    Okay.
11  A.    And this is as of 1/13/09, right?
12        Q.    No, I think if you look at it, and
13  there again I'm just reading across the line that
14  B is, there's a tracking date and there is
15  10/10/2001, do you see that?
16  A.    Okay.
17        Q.    I'm not going to really ask you any
18  questions about that.
19  A.    Okay, okay.
20        Q.    And I believe you testified you were
21  not aware of any flood certification being done
22  on October 10th, 2001, correct?
23  A.    The only -- the only -- say that question
24  again?
25        Q.    A few minutes ago I think you
0084
1  testified you were not aware that a flood
2  determination was performed on the Alexanders'
3  property in October of 2001?
4  A.    October of 2001?  The property didn't close
5  until January of '02.
6        Q.    Correct.
7  A.    So '01 I would not have known about that.
8        Q.    Okay.
9  A.    I can only speak -- the only -- the
10  earliest document I think I saw was in '02.  So
11  we're talking '01.
12        Q.    Correct.
13  A.    Am I correct, is that a correct statement?
14        Q.    That's correct.
15  A.    So '01 I would say, no, I did not see, I
16  was not aware of an '01 document.
17        Q.    Okay.  Flipping back over to page one
18  of your report.
19  A.    Correct.
20        Q.    There's the statement there in the
21  third paragraph that says:  Many people believe
22  that the appraisals, insurances and surveys are
23  for the borrowers protection.  Do you see that
24  statement?
25  A.    Uh-huh.
0085
1        Q.    Now that I think you covered earlier
2  is not completely correct, right?
3  A.    No, it's not.
                          Page 35

Alexander vs Countrywide Home (final).txt
```
 4        Q.    Okay.  Whose protection are these
 5   documents prepared for?
 6   A.    Actually the person that has the most to
 7   lose, which is in this case is the person that
 8   advances the money.
 9        Q.    Right.
10   A.    So the perception is that, you know, it's
11   the buyers.  And as I go more and more into it I
12   realize it's, you know, to just make sure the
13   collateral is protected.
14        Q.    Okay.  Was there a rule or regulation
15   in effect at the time the Alexanders closed their
16   loan that stated that all of the taxes and
17   insurance related to their property in Long
18   Beach, Mississippi should have been escrowed?
19   A.    Say that again, a law?
20        Q.    A rule or regulation that would have
21   required the Alexanders to escrow all of their
22   taxes and insurance when they closed this loan?
23   A.    Yeah.
24              MR. GIBSON:  Objection to the form,
25        calls for legal conclusion.  You can answer
0086
 1        the question, Mr. Petrucelli.
 2   A.    Yeah, I mean, legally I'm not telling you.
 3   I can tell you that it was required as per the
 4   settlement documents that were presented to me.
 5        As far as the law, I mean, I'm not a
 6   lawyer.  I can tell you the documents spoke and
 7   the interpretation of the client that there was
 8   an escrow going to be required of them at
 9   closing.
10        Q.    Okay.  Well I just ask that attached
11   to your report as Exhibit B-1, if you would look
12   at B-1.
13   A.    B-1.
14        Q.    There are requirements A, do you see
15   that?
16   A.    Yes.
17        Q.    And it says:  VA does not require the
18   lender to establish escrow accounts for the
19   collection and payment of property taxes, hazard
20   insurance premiums and similar items.  Do you see
21   that?
22   A.    Yeah, but you're not -- they're not the len
23   -- Countrywide is not the lender, they're the
24   servicer.
25        Q.    Okay.
0087
 1   A.    But again, the establishment was done at
 2   the closing table.
 3        Q.    Uh-huh.
 4   A.    So I'm not sure, I'm not sure.
 5        Q.    Okay.  And VA closed this loan?
 6   A.    VA closed this loan.
 7        Q.    Okay.
 8   A.    But can I also add another one?  It says:
 9   Where it's not establishing an escrow it's
10   required and assumes the responsibility that they
11   were paid timely.  I mean, it says:  The VA does
12   not require a lender to establish it.  But it
13   does say, however, it is the lender's
14   responsibility to ensure, it doesn't say the
```
                              Page 36

Alexander vs Countrywide Home (final).txt
15  customers, it says the lender's responsibility to
16  ensure that items are paid timely.
17          Q.    Correct.  And by who?
18  A.    By the VA.
19          Q.    The VA pays the premiums and
20  insurance?
21  A.    The VA is saying it's the lender's
22  responsibility to ensure that these items are
23  paid.
24          Q.    Timely?
25  A.    Timely.
0088
 1          Q.    Okay.  Timely by who?
 2  A.    It doesn't specify.
 3          Q.    Okay.  Okay.  Do you know if the
 4  Alexanders were charged a fee for not escrowing
 5  any insurance premiums?
 6  A.    Do I know of that knowledge?
 7          Q.    Yes.
 8  A.    No.
 9          Q.    Okay.  In your report you state there,
10  I guess it's --
11  A.    Can you tell me the page?
12          Q.    It's page one.
13  A.    I'm sorry, because we're jumping around.
14          Q.    Yes.  I believe it's paragraph five,
15  you make the statement that:  Clearly the
16  Alexanders had insufficient equity as they
17  obtained 100 percent financing.  What do you mean
18  by insufficient equity?
19  A.    Well with a VA guaranty typically these
20  loans exceed 100 percent financing.  So there
21  obviously is no equity in the property, because
22  the VA guaranty enables whoever's lending to give
23  them 100 percent of the value.
24          So if it was a $100,000 property what that
25  VA guaranty, which I've asked for too, that is
0089
 1  another document, like, where are we with the VA
 2  guaranty?  I mean, if this property was destroyed
 3  by natural disaster that would trigger VA
 4  immediate action to prompt the guaranty.  So I'm
 5  curious as to where we are within the guaranty
 6  process as far as the servicer.  But that's
 7  another question.
 8          But what it's basically saying is if
 9  something is 100 percent financed, that would be
10  all of the more reason that the insurance would
11  be an important aspect.  As opposed to lets say
12  someone that was 50 percent financed.  Not that I
13  wouldn't tell you to get insurance, but clearly a
14  VA loan is perceived to someone in the industry
15  as a 100 percent financing vehicle.  Because they
16  do not come to closing with a deposit.
17          If we were to go with that same D-1 that we
18  just discussed, the purchase price is 164, you
19  can see the loan is 166.  So we actually VA
20  enables you to get every dollar of the sale
21  price.
22          Q.    Uh-huh.
23  A.    And it's because of the ability of a
24  veteran who gets what they call a DD4 and they
25  have an eligibility card that they present, and
Page 37

Alexander vs Countrywide Home (final).txt

0090
```
 1   it enables them to be insured up to whatever that
 2   certificate is, they call it the VA guaranty.
 3        Q.   Uh-huh.
 4   A.   So one of my questions was, where are we in
 5   the guaranty process of that?
 6        Q.   Okay.  All right.  Are you assuming in
 7   that insufficiency equity statement that the
 8   Alexanders paid what the property was worth?
 9   A.   What I'm saying is that there is no
10   availability of any equity in the property
11   because you're paying the value of the property
12   supposedly.  I would hope, again I don't have the
13   appraisal, but I would hope it would be the
14   value.
15        Q.   Okay.
16   A.   In today's market we would be in trouble to
17   make that statement, because I think property
18   values have gone down.
19        Q.   And that's my point, it depends on
20   what the property's worth, correct?
21   A.   Absolutely.
22        Q.   Okay.  And this was a foreclosed piece
23   of property?
24   A.   I don't know that.  I'm assuming it's an
25   owned property by the VA, so it had been
```
0091
```
 1   foreclosed on.
 2        Q.   Right, right.  And it's possible the
 3   Alexanders could have gotten a good deal on the
 4   property?
 5   A.   Potentially.
 6        Q.   Yeah.  And it could be worth more than
 7   what they got it from the VA?
 8   A.   My contention is not to question the value
 9   by that statement.  My contention is that there
10   is a hundred percent financing available.  And
11   without the appraisal I couldn't make that, you
12   know, I understand your point.
13        Q.   Okay.
14   A.   But I think it's any time we see a VA loan
15   we know that there's very little if not often
16   equity.  But if you're telling me it's an REO,
17   and unfortunately I don't know Mississippi
18   property values back in that period of time, so
19   I'm not sure.
20        Q.   Okay.  So the property could be worth
21   more, but you're just not sure, correct?
22   A.   It could be worth more.
23        Q.   Okay.
24        MR. GIBSON:  Do you want to take a
25   break?
```
0092
```
 1        THE WITNESS:  Yes.
 2        (A short break was taken.)
 3        Q.   I'm going back to your report.
 4   A.   Okay.
 5        Q.   On page one there the sixth paragraph.
 6   What's the basis for your statement there that
 7   adequate flood insurance was maintained by
 8   Countrywide Home Loans between January 23rd,
 9   2002, and March 23rd, 2005?
10   A.   Reviewing the history of the file and the
```

Page 38

Alexander vs Countrywide Home (final).txt

11  establishment of the escrows from the inception
12  of the property as seen in the engineer's
13  elevation survey, which has been my experience is
14  the real only way to tell the impact of the
15  flood. We often see flood certificates and we're
16  required to do it. Our terminology for it that
17  I've --
18        Q.   I hate to interrupt, you Mr.
19  Petrucelli, but that was not really my question.
20  My question is, you made the statement that
21  Countrywide maintained the premiums for the flood
22  insurance between that time, what is the basis
23  for that statement?
24        MR. GIBSON:  Objection to the form, it
25  mischaracterizes the document.
0093
1         Q.   Okay, let me read the document then.
2  And this is paragraph six.
3         MR. GIBSON:  Uh-huh.
4         Q.   The claims in this case arose from a
5  canceled flood insurance policy on or about
6  March 3rd, 2005. That means from the original
7  closing date, which was January 23rd, 2002, up
8  until March 23rd, 2005 adequate flood insurance
9  was maintained by Countrywide.
10  A.    What that means is as the servicer of the
11  loan adequate coverage had been maintained under
12  the aus-- because if you read the -- if you read
13  one of the letters, um, there was a translate --
14  when the VA did this loan they said all
15  correspondence and all payments and everything
16  should be to Countrywide.
17        Q.   Okay.
18  A.    So when I say adequately maintained is that
19  flood insurance was being maintained under the
20  direction of Countrywide's servicing.
21        Q.   Okay. Are you making the
22  representation that Countrywide made the premium
23  payments --
24  A.    I didn't say that.
25        Q.   -- out of escrow --
0094
1  A.    I didn't say that.
2         Q.   -- for the flood insurance?
3  A.    I didn't say that. I said under the main
4  -- under the direction of Countrywide it was a
5  requirement, as far as I'm concerned by the
6  documents that I see, that flood insurance be
7  maintained. I have not seen a document contrary
8  to that.
9         Countrywide has the ability, and as any
10  servicer, to put forced place insurance if the
11  insurance is required. I did not make the
12  statement that it was paid by Countrywide. So I
13  did not -- I don't -- if you're asking me did I
14  say Countrywide paid it? No.
15        Q.   Okay.
16  A.    Okay. So I can answer it that way.
17        Q.   Have you seen any evidence that
18  Countrywide made any premium for flood insurance
19  payment to Allstate Insurance?
20  A.    Again, I can't, because all the documents I
21  had have, like, one lump sum. And unfortunately
                        Page 39

Alexander vs Countrywide Home (final).txt

```
22  it says it just takes -- the escrow statements
23  I've had have been money going in and out.  And
24  we tried to match them up based on the documents
25  we have.  So I've never been given the actual
0095
 1  canceled checks.  Because Countrywide would have
 2  made some kind of payments.  Can I say that they
 3  paid flood?  No, if that's your question.
 4         Q.   Okay.  So you're not representing that
 5  Countrywide paid any premiums?
 6  A.    No, I'm not.
 7         Q.   Okay.  The next statement after that
 8  says Countrywide did not follow VA guidelines.
 9  What VA guidelines are you referring to?
10  A.    In the pamphlet, the pamphlet.  And also,
11  um, as part of the guaranty if you read, I
12  believe when you go through the guaranty
13  documents it will say that if adequate insurance
14  is not made it will void the guaranty.
15         Q.   Okay.
16  A.    So if you're servicing the loan for the
17  lender and the insurance is not adequately there,
18  the VA guaranty may be void.
19         Q.   Okay.  And as we discussed earlier
20  today, that affects the lender, correct, because
21  the lender has to --
22             MR. GIBSON:  Objection to form.
23         Q.   -- eat that loan, correct?
24  A.    It affects the ultimate consumer actually.
25         Q.   How so?
0096
 1  A.    Because now he doesn't have a guaranty.  So
 2  now he's not going to have his loan covered.  In
 3  my understanding of VA guidelines a national
 4  declared disaster automatically triggers a
 5  guaranty.  The only way that that guaranty would
 6  not kick in is if there wasn't the proper
 7  maintenance of insurance.
 8         So what my question would be is, at this
 9  stage of the game has the VA offered the
10  guaranty?  I mean, only the servicer would know
11  that.
12         Q.   Okay.  So once the guaranty is removed
13  by the VA, lets just say a hypothetical situation
14  the guaranty was removed.
15  A.    Right.
16         Q.   The lender has to reassume that loan,
17  right?
18  A.    Correct.
19         Q.   Okay.  And but the borrower just
20  simply keeps making the payments, don't they?  I
21  mean, how does it impact the borrower?
22  A.    No, if it's -- my understanding again, and
23  is that the VA's guaranty absolves the people
24  because of a national disaster.  It's in their
25  regulations, I mean, they have a pamphlet on it,
0097
 1  I believe, and, you know, I think I can show it
 2  to you.
 3         But the one caveat is if they can -- and
 4  I'm not sure that this is the case in this
 5  situation because I'm speaking without looking at
 6  the VA, because I have not seen any
```

Page 40

Alexander vs Countrywide Home (final).txt
```
 7   correspondence from the VA at this point.
 8         Q.   Okay.
 9   A.    So I would really like to see
10   correspondence from the VA.  But if you're the
11   servicer and one of the requirements of the
12   guaranty is that adequate insurance be paid, then
13   if you don't have adequate insurance, regardless
14   of who pays for it, and that guaranty is not
15   available, then that's where I think that's what
16   we're discussing in that particular paragraph.
17   Is that the whole purpose of that loan is to keep
18   that guaranty in place.  Because that guaranty is
19   what insures the loan in the form of a default.
20         Q.   Okay, in the event of a default,
21   that's right.  As long as the customer keeps or
22   the borrower keeps making the payments though no
23   one loses, correct?
24   A.    But the borrower would be --
25              MR. GIBSON:  Objection to the form.
0098
 1   A.    Okay.  But the borrower wouldn't have to
 2   keep making the payments is my point.
 3         Q.   Okay.  Why?
 4   A.    Because it was a national disaster, and it
 5   says it under a national disaster.  And had flood
 6   insurance been maintained the mortgage would have
 7   been paid off.
 8         Q.   Okay.  I think you misunderstood my
 9   question.
10   A.    Okay, I apologize.
11         Q.   You referenced a national disaster.
12   I'm not speaking of the Alexanders now.
13   A.    Oh.
14         Q.   In general earlier you recall we were
15   talking about the guaranty is removed in a
16   situation it hurts the lender, do you recall that
17   testimony?
18   A.    It hurts -- it ultimately would hurt the
19   lender.
20         Q.   That's correct.
21   A.    Ultimately at the end of the day the person
22   that would get hurt would be the lender because
23   they didn't get paid back fully.
24         Q.   That's right.
25   A.    But if the guaranty is not there it would
0099
 1   hurt the borrower, it would hurt the consumer.
 2         Q.   In the event there was a natural
 3   disaster that would kick in the guaranty?
 4   A.    Correct.
 5         Q.   Okay.  Do you know in regard to the
 6   Alexanders' loan if the guaranty has been revoked
 7   on their loan?
 8   A.    No, that was I think one of my requests has
 9   been, and Counsel can attest, is I really would
10   like to see the VA correspondence.  Because even
11   with the flood insurance the VA would be the only
12   one that could remove the flood insurance after
13   it being required.
14         So it's kind of important, you know, at
15   this stage of the game, where is the VA?  You
16   know.
17         But certainly it would not be Countrywide's
                          Page 41
```

Alexander vs Countrywide Home (final).txt

18  call to cancel the flood insurance, or allow it
19  to be canceled. They really should have and in
20  practice should have said the VA had you
21  established flood insurance at the inception of
22  this problem. The VA, because typically if I'm a
23  lender and if someone's willing to pay flood
24  insurance I'm going to say pay it. Because I
25  would be paying, you know, I would be better
0100
1   protected as the lender.
2           So at this stage I really would like to see
3   the VA correspondence in this. Because I believe
4   Countrywide has to give the VA a report on every
5   loan.
6       Q.   Okay.
7   A.   So...
8       Q.   So you're not sure at this point where
9   we stand in terms of the VA guaranty?
10  A.   No.
11      Q.   Okay. When I asked you earlier about
12  the guidelines that you were referring to you
13  mentioned the word the pamphlet, and you have
14  several exhibits in your report.
15  A.   Yeah, I've attached them.
16      Q.   Would exhibit B be the pamphlet that
17  you were referring to?
18  A.   Yeah, you see 26 9 revised chapter nine
19  legal instrument, liens, escrows and so forth.
20      Q.   Okay.
21  A.   These are typically in the guidelines of
22  the VA. The VA sends out guidelines, they'll
23  send out specific, you know.
24      Q.   Okay.
25  A.   So that it helps try to --
0101
1       Q.   What part of Exhibit B do you think
2   was violated by Countrywide?
3   A.   Excuse me? Which one, we're on Exhibit B?
4       Q.   Yes, uh-huh.
5   A.   I believe that it's the lender's
6   responsibility to have flood insurance obtained
7   and maintained.
8       Q.   Okay. So the lender is responsible
9   for ensuring that flood insurance is obtained and
10  maintained on any building?
11  A.   Right. But the lender -- again, absent the
12  service agreement it's again the assumption that
13  once you become the service provider, unless it
14  specifically excludes it in the service agreement
15  that I'm not aware of.
16      Q.   Uh-huh.
17  A.   That you take on -- you become responsible
18  for anything the lender would be responsible for.
19      Q.   Okay.
20  A.   But again, we really should have the
21  servicing agreement, and that would -- because it
22  would spell it out. And it probably would say
23  you're required to do the insurance.
24          I mean, the typical servicing agreements I
25  had that when we were considering servicing they
0102
1   tell you we're going to do this. It's this rate
2   if we have to go into default, it's this rate if

Page 42

Alexander vs Countrywide Home (final).txt
25 going to dispute that. I'm not going to
0107
1 stipulate it here today.
2  But other than that Bates label that
3 appears at the lower right-hand side of Exhibit B
4 there's nothing else on the document to indicate
5 that it is a Countrywide document, is there?
6  MR. GIBSON: Go ahead and answer his
7 question.
8 A. I would say-- say the question one more
9 time, because I want to answer it the right way.
10  Q. Other than the Bates label that
11 appears at the lower right hand --
12 A. That is a correct statement, that is a
13 correct statement.
14  Q. Okay. So if exhibit number four was
15 not a Countrywide document, back to my original
16 question, how would Countrywide have known about
17 the Allstate flood insurance policy?
18 A. Um, how would Countrywide know about it?
19 If the Department of Veterans Affairs or the
20 client or their client the consumer didn't tell
21 them, likely they would not possibly know about
22 it.
23  Q. Okay.
24 A. So it would require that the VA -- if the
25 VA didn't share their package with them or didn't
0108
1 share their information obviously they might not
2 know. Or if the customer didn't communicate it
3 they might not know.
4  Q. Right, because the VA sold the
5 property to the Alexanders?
6 A. Uh-huh.
7  Q. The VA closed the loan on the property
8 to the Alexanders, correct?
9 A. Correct.
10  Q. The Alexanders were at the closing of
11 the VA loan, correct? But those were the only
12 parties that took part in the closing of the
13 loan, correct?
14 A. Correct.
15  Q. Okay. If you will flip back to
16 Exhibit D, I believe it's D-1 of your report.
17 A. D-1 of my report, go ahead.
18  MR. GIBSON: D?
19  THE WITNESS: D-1.
20  Q. Wait a minute, is it just D, I'm
21 sorry?
22  MR. GIBSON: I think we might have
23 referred to it as D at one point.
24 A. This is what we called as D, the HUD-1.
25  Q. The HUD-1, that's correct.
0109
1 A. Page one or page two of it? The first
2 page?
3  Q. Lets see.
4 A. I think you're talking about page two.
5  Q. Page two, yes. There's some stars by
6 some numbers there on page two, line -- I think
7 it is line eight or excuse me 904 it says flood
8 insurance premium for.
9 A. Correct.

Alexander vs Countrywide Home (final).txt
```
10        Q.   And you see there's a $345 figure?
11   A.   Yes.
12        Q.   Okay.  Who was that paid to?
13   A.   The POC refers to paid outside closing.
14        Q.   Right.
15   A.   So typically what happens in that case is
16   you would have to provide the proof of payment to
17   the VA and a declaration page would have to
18   accompany it.  But that would -- you would have
19   to demonstrate proof.  But in that case whenever
20   you close a loan typically you have to pay the
21   first year of premium up front, so you couldn't
22   escrow for it.  So typically the buyer the
23   borrower would pay what they call the premium in
24   full up front.  So POC refers to paid outside of
25   closing.
0110
1         Q.   But who was the insurance company that
2    they paid, do you know?
3    A.   I believe from going through the documents
4    it was I believe it was State Farm at that time.
5         Q.   Right.
6    A.   Correct, I think I remember it being State
7    Farm.
8         Q.   So they paid State Farm at closing?
9    A.   Correct.
10        Q.   And then at some point after I guess
11   they decided to go with Allstate Insurance, is
12   that correct?
13             MR. GIBSON:  Objection to form.  Go
14        ahead.
15   A.   It changed at some point in time, yeah.
16        Q.   Okay.  Do you know if Countrywide was
17   ever given notice that Allstate Insurance was the
18   carrier for the flood insurance for the
19   Alexanders?
20   A.   Me personally?
21        Q.   Yes.
22   A.   No.
23        Q.   Okay.  Have you seen any evidence that
24   Countrywide was notified that Allstate Insurance
25   was the flood insurance carrier provided to the
0111
1    Alexanders?
2    A.   I thought I saw some correspondence with
3    our client.  At this point I would have to say
4    no, but not anything formal.
5         Q.   Okay.
6    A.   If you're asking me formally, I thought I
7    saw some communication.
8         Q.   Okay.  Did it mention the name
9    Allstate Insurance Company?
10   A.   I think it was more of a broker, I think it
11   was more of an insurance agent that was involved.
12        Q.   Okay.
13   A.   So again, there's no specific --
14        Q.   Okay.
15   A.   -- Allstate document that I saw or
16   notification, if that's what you're asking me.
17        Q.   Okay.
18   A.   Was that the question?
19        Q.   That was the question.
20   A.   Okay.
```
                              Page 46

Alexander vs Countrywide Home (final).txt

21     Q.    How would Countrywide have known about
22 the potential lapse in coverage of the Allstate
23 flood insurance policy for nonpayment of
24 premiums?
25 A.    Notification, notification would be
0112
1 required.
2     Q.    Right.  Have you seen any proof or any
3 document or any evidence that Countrywide
4 received notice that the Alexanders' flood
5 insurance policy with Allstate was going to be
6 canceled for nonpayment of premium?
7 A.    Have I seen any documentation?  To
8 cancellation to Countrywide, no.
9     Q.    Okay.  Bottom of page one, you make
10 the statement, this is of your report again
11 Exhibit 1:  Countrywide appears to not have
12 directly applied the payments to the outstanding
13 loan balance or restoration of the property as
14 required by the VA.
15 A.    Uh-huh.
16     Q.    What is the basis that the insurance
17 payments were not applied to the loan balance?
18 A.    The deed of trust, it spells it out in the
19 VA deed of trust.
20     Q.    No, no, no, I'm talking about actual
21 insurance proceeds?  I mean, you seem to say
22 there that when you say payments I assume you're
23 meaning insurance payments?
24 A.    The proceeds.
25     Q.    From the insurance policy?
0113
1 A.    From the insurance policy.
2     Q.    And we're changing gears now, this is
3 the hazard insurance policy, right?
4 A.    Yeah, we were just talking floods.  So
5 we're talking about the wind -- no, we're not
6 even talking about the hazard, we're talking
7 about the wind insurance, it's specifically
8 different, this has nothing to do with the
9 hazard, this is a separate policy.
10     Q.    You're correct, and I appreciate you
11 correcting me on it, it was the wind policy.
12 A.    Right, yeah, because there was three
13 policies, which just added more confusion to this
14 situation.  But this was a wind policy --
15     Q.    Correct.
16 A.    -- that we received money on, I believe it
17 was like $86,000.  By the way, there was a
18 correction to the report because there was a
19 typo, so I just wanted you to know that.
20     Q.    Oh, tell me about that now.
21     MR. GIBSON:  It's on the list of
22 exhibits.
23 A.    It's just an exhibit, so under H-1.
24     Do you have the copy of that?
25     MR. GIBSON:  Yeah.
0114
1 A.    It was just what happened is on H-1 over
2 here it just says you see it has the wrong zero,
3 you see how the zero is in there, but the check
4 number is right.
5     Q.    I see.
                        Page 47

Alexander vs Countrywide Home (final).txt

17    to the loan?
18    A.    If you look at my report we can pretty much
19    follow how we, you know, and go through the
20    schedule --
21        Q.    Okay.
22    A.    -- that was prepared.  I believe we're
23    looking at it, you know --
24        Q.    Okay.  Just for the record, you are
25    now referring to what has been marked as --
0117
1    A.    Exhibit H.
2        Q.    -- Exhibit H --
3    A.    Right.
4        Q.    -- to your report?
5    A.    Right.  Which you can see at that time,
6    according to the documentation we were provided,
7    there was a balance of approximately on 11/30/05
8    of $145,000.  You know, we try to calculate the
9    interest based on the interest rates and so
10   forth, but they received $86,000 --
11       Q.    Okay, excuse me, now you are on
12   obviously not page one of Exhibit H?
13   A.    Right.
14       Q.    You are on --
15   A.    You want to go to page one, two, three,
16   page three of Exhibit H.
17       Q.    Okay.
18   A.    If you look toward the bottom.
19       Q.    Yes.
20   A.    We followed the cycle of how this loan was
21   going and broke it out between principal interest
22   and escrow, advances from escrow we factored all
23   that stuff in, and then we determined what the
24   balance was, okay, as of 11/30/05.  Because there
25   had been, if you look earlier there was a $15,000
0118
1    payment made on 11/14/05.
2        Q.    Uh-huh.
3    A.    So what we did is we said, okay, you have a
4    lump sum payment of 15 brings it to 145.  And
5    then we just keep following your tables and your
6    numbers and then we come to the lump sum payment
7    on January 26th of the $86,600.96.
8        Q.    What was the basis for using
9    January 26th?
10   A.    That goes to speaks to the actual check in
11   the amount that the check was made out to the
12   Alexanders and Veterans Affairs Countrywide Home
13   Loan, Inc. in the amount of $86,600.96 and the
14   date of the check.
15       Q.    Okay.  So you're assuming that the
16   check should have been applied to the loan
17   balance on January 26th?
18   A.    Or within a reasonable period of time.  Yeah, I think
19   they have a certain period of time.  I think you
20   have to apply within a certain period of time
21   under the rules.
22       Q.    What rules?
23   A.    The normal, I think they have 30 days, any
24   money -- any money that's given to any agent of
25   a, you know, in an escrow situation, I think you
0119
1    have because it's in escrow and somebody is
                    Page 49

Alexander vs Countrywide Home (final).txt
13 apologize, it's so bad.
14      Q.   It is.
15 A.   Can you give me, like, two minutes?
16      Q.   Sure, sure.
17      MR. GIBSON:  Take your time.
18      (A short break was taken.)
19      Q.   Back on the record.  Prior to the
20 break I was asking now on page one you state that
21 it appears Countrywide has failed to follow VA
22 guidelines, and you've gotten a copy now of
23 Exhibit 5.
24 A.   Which is similar to my Exhibit G-1.
25      Q.   Exhibit G-1 in your report.
0122
 1 A.   Correct.
 2      Q.   Are you saying that the deed of trust
 3 provides the VA guidelines?
 4 A.   The deed of trust is generated from the VA
 5 guidelines.
 6      Q.   Okay.  So at the bottom of page one
 7 then you're referring to the language in the deed
 8 of trust?
 9 A.   Correct.
10      Q.   Okay.  What paragraph in the deed of
11 trust are you referring to?
12 A.   Two B.
13      Q.   Two B, okay.  And this relates to
14 insurance proceeds?
15 A.   It talks about, you know, how payments are
16 applied and so forth.
17      Q.   Okay.  And now you say payments?
18 A.   Because we were talking -- you were talking
19 about the paragraph where we're saying didn't --
20 we're not talking about insurance in that
21 paragraph, we're talking about how proceeds were
22 paid that exceeded the actual monthly payment and
23 how they should be applied.
24      Q.   Okay.  I thought we were talking about
25 insurance proceeds, the $86,000 check, are we
0123
 1 not?
 2 A.   It's proceeds from insurance, but we're
 3 talking about how the application applies.
 4      Q.   Okay.
 5 A.   So when we're looking at -- when you refer
 6 to that paragraph and what we're discoursing in
 7 our report is we're talking about when something
 8 is received beyond the normal payment amount --
 9      Q.   Uh-huh.
10 A.   -- how it gets the order of application.
11      Q.   Okay.
12 A.   Which says if there's any old interest, any
13 old taxes and so forth, and that's the premise by
14 which we try to formulate what the amount owed
15 was.
16      Q.   Okay.  Now there are other paragraphs
17 in the deed of trust that apply to the
18 application of insurance proceeds, aren't there?
19 A.   You want to point out which one?
20      Q.   Paragraphs eight and nine --
21 A.   Thank you.
22      Q.   -- of the deed of trust specify under
23 the VA guidelines how insurance proceeds are
                                    Page 51

Alexander vs Countrywide Home (final).txt
24  handled, do they not?
25  A.    Yeah, I know that every deed of trust
0124
1   speaks to insurance and stuff like that.  So
2   based on -- yes.
3        Q.    Okay.  Do you know of any evidence to
4   indicate that Countrywide violated paragraphs
5   eight and nine of the deed of trust in its
6   application of the insurance proceeds?
7   A.    To answer that question, I wasn't asked
8   that question, I'd have to read these first --
9        Q.    Okay.
10  A.    -- before I can answer them.  If you want
11  me to read them and then get back to you I can do
12  that.
13       Q.    Well take your time, yes, you're
14  welcome to read through them.  We'll take just a
15  short break.
16  A.    Okay, I got it.  Do you want to read me
17  back your question?
18       Q.    Yes.  Are you aware of any evidence
19  that Countrywide violated the provisions for the
20  application of insurance proceeds set forth there
21  in paragraphs eight and nine?
22  A.    This does not speak to the servicing, so
23  no.
24       Q.    Okay.
25  A.    This would just speak to the -- this is the
0125
1   deed of trust with the borrower.
2        Q.    Uh-huh.
3   A.    And talks about how the borrower should
4   maintain insurance and so forth.
5        Q.    Okay.
6   A.    But again, that was talking into how --
7   that particular paragraph is not talking about
8   insurance, other than the payment that was
9   received and how to apply it to the principal.
10  So I'm confused by the relevance of that to that.
11  So maybe if you can clarify it I can give you a
12  better answer.
13       Q.    Okay.
14  A.    I apologize, it's just bad to read.
15       Q.    No, that's okay.  Alright, now back to
16  page two of your report, and I'm going to go very
17  quickly through these.
18  A.    Okay.
19       Q.    And page two again is the assignment
20  that you were delegated by Counsel.
21  A.    Questions.
22       Q.    Yeah.  Number one I think is probably
23  pretty easy assignment, whether the flood
24  insurance and flood insurance proceeds would have
25  provided a benefit to the borrower and VA?  I
0126
1   think we can a all agree.
2   A.    I think we can all agree on that one, yes.
3        Q.    Yeah, it would have.
4        Item number two, whether Countrywide
5   as the servicer should have protected the
6   Alexanders and the VA's collateral, etcetera.
7        What processes are put in place at
8   closing regarding flood insurance, just in
                              Page 52

Alexander vs Countrywide Home (final).txt

9  general now, not in this case but in general?
10 A.   Um, the same processing's that are in
11 hazard or any other insurance, you know, they
12 spell it out, you know.  Typically there's, you
13 know, they're pretty detailed, you know, making
14 sure the endorsements are proper, like you
15 pointed out, and that the insurance is paid in
16 force and in full at closing.  We're talking from
17 the closing point on, right, that was your
18 question?
19      Q.   Uh-huh.
20 A.     So typically that sets the whole
21 groundwork.  So it's established that it's in a
22 flood.  I can tell you it's usually very
23 difficult to get flood insurance removed once
24 you've had it.
25      Q.   Okay.
0127
1  A.   So I hope I answered your question.
2       Q.   I think so.
3  A.   Okay.
4       Q.   And this process again is established
5  by the National Flood Insurance Act, correct?
6  A.   The process --
7            MR. GIBSON:  Objection to form.
8  A.     The National Flood Insurance has nothing to
9  do with the closing process of a lender.  It has
10 to do with giving the people the ability to get
11 flood insurance, from a lender's perspective.
12 I'm sure it might have a total different meaning
13 to somebody else.
14      From a lender's perspective we don't even
15 know of the National Flood Insurance Protection
16 Act.  We just know that our client has some level
17 of flood.  We typically are required to do a we
18 call them drone searches or survey, because
19 depending on the level will dictate the premium.
20      So we instruct our client, look, it appears
21 to be you have a flood issue, it behoves you to
22 go get it and see what level, because flood
23 insurance premiums in New Jersey can be very
24 high.  I'm sure where you are in Mississippi is
25 probably a lot worse.
0128
1       But typically that's how it works from our
2  perspective in getting, you know, to the closing
3  table and assigning insurance, finding out what
4  level of insurance you need.
5       But it's pretty much the same for every
6  insurance policy, whether it be flood, you know,
7  wind, hazard, whatever type you want to do.  So
8  does that answer your question?
9       Q.   Yes.
10 A.   Okay.
11      Q.   Task number three related to the
12 application of penalties, interest and
13 foreclosure costs by Countrywide.  Did you find
14 any improper penalties charged by Countrywide to
15 the Alexanders?
16 A.   Again, this is not -- this is, um -- no, I
17 did not.  So I can say no to that.
18      Q.   Okay.
19 A.     So I can say no to that.  So I can answer
                        Page 53

Alexander vs Countrywide Home (final).txt
20  that with a no, absolutely no.
21       Q.   Okay.  Did you find any improper
22  foreclosure costs charged to the Alexanders by
23  Countrywide?
24  A.   No.
25       Q.   Okay.  I think we touched on this with
0129
1   another exhibit to your report, but I think your
2   testimony earlier was that you are contending
3   that there were improper interest charges by
4   Countrywide to the Alexanders?
5   A.   No, no I did not contest it.  I'm
6   contesting that the lump sum payment was not
7   properly applied to the principal, which
8   ultimately would lead to interest calculations
9   being incorrectly.
10       Q.   Okay.
11  A.   So if you had a $100,000 item then I'm
12  charging six percent.  If I gave you 50,000,
13  that, unfortunately in the mortgage process, is
14  still being calculated as if you had the whole
15  $100,000 of interest responsibility.
16       It's the whole concept of high and biweekly
17  payments and effectuating principal.  So the note
18  says you can charge six and a half, but once you
19  have a substantial payment towards the principal
20  you're now paying less interest, even though the
21  payment is requiring you to pay that number.
22       Q.   Okay.  And this opinion of yours
23  originates with the fact that the 86,000 some odd
24  dollar check should have been applied in January
25  of 2006 when it was dated?
0130
1   A.   When it was received.
2        Q.   Or received, okay.
3   A.   Less any verifiable expenses that were
4   allowed, so...
5        Q.   Okay.  If, and this is an if, it is
6   shown that no interest was charged to the
7   Alexanders from and after February 24th, 2006 on
8   the $86,000, would that have been an appropriate
9   application of those insurance proceeds?
10  A.   If no interest was charged?
11       Q.   After February 24th, 2006?
12  A.   February 24th, 2006, no interest was
13  charged?
14       Q.   If that proves to be the case?
15  A.   If that was the case that would -- then
16  your principal balance -- again, if there's no
17  interest charged then obviously, but yes.
18       Q.   Okay.  If that were proven then
19  Countrywide would have acted properly in regard
20  to the application of the $86,000 check?
21  A.   But according to the escrow documents we
22  have that wasn't what was shown.  So if you show
23  me a document that's different than the document
24  that was provided, then your statement will be
25  accurate.
0131
1        But the document didn't speak that way.
2   The document spoke to it not being applied that
3   way and as if the mortgage was just going down
4   the regular normal amortization.  It didn't
                              Page 54

Alexander vs Countrywide Home (final).txt
23      Q.   Okay.  Is there a specific guideline
24   that you looked at?
25   A.    They've been in -- I mean, as to the best
0141
1    of our ability in our report we pretty much hit
2    the guidelines that we thought kind of spelled it
3    out from the particular thing we were asked.
4        Q.   Okay.
5    A.    Which was the VA pamphlet, you know,
6    specifically ten, you know, eleven talked about
7    escrows.
8        Q.   If you could refer to that by exhibit?
9    A.    Exhibit B, Exhibit B-1, Exhibit B-2.
10       Q.   Okay.
11   A.    Does that answer your question?
12       Q.   It did.
13   A.    Okay.
14       Q.   How did you know to go to these
15   guidelines?
16   A.    Again, we've had defaults on VA loans,
17   so...
18       Q.   Okay.  And this would be in your
19   lending business?
20   A.    Yeah, it would be in our lending business.
21       Q.   Okay.
22   A.    And, you know...
23       Q.   Did you find any evidence that showed
24   you Countrywide had been given notice that the
25   Allstate flood insurance policy had been
0142
1    canceled?
2    A.    I answered that for you once before, and I
3    said no, not conclusively, no.
4        Q.   Okay.  And I apologize if I've asked
5    that before.
6    A.    You asked that quite a few times.
7        Q.   Okay.  Item number six you were asked
8    to find what obligations did Countrywide assume
9    in servicing the loan.  What obligations did you
10   find?
11   A.    Again, I just cited those exhibits to you.
12   But typically VA has a whole site, I think now
13   they've become electronic and they use a site
14   called Valera but the VA would spell this out
15   beyond any service agreement you could ever want.
16       Q.   Okay.
17   A.    So, you know...
18       Q.   So the same VA regulations?
19   A.    The same VA.  But I can tell you the VA has
20   specific guidelines for servicer's, they have
21   that detail.
22       Q.   Okay.
23   A.    I didn't go in that direction, because I'm
24   assuming that I don't have to speculate because
25   there's an agreement that exists.  So I could
0143
1    have printed out and given you, like, a VA
2    servicing agreement if we were to become a VA
3    servicer, I've seen it.  But I don't know if
4    Countrywide has a different deal than I would get
5    because of the volume and the circumstances.
6        So, again, I was hoping to have that actual
7    service agreement and then I wouldn't have had to
                          Page 59

Alexander vs Countrywide Home (final).txt
19    there, barely. Who prepared Exhibit A?
20    A.    I have no idea.
21        Q.    Typically in a closing situation who
22    would prepare this form?
23    A.    This would be prepared by who's ever taking
24    the process, who's ever doing the process, who's
25    ever involved in the process.
0146
1        Q.    Okay.
2    A.    This is, like, one of their forms, this is
3    like, you know, a part of their package. But
4    this would be somebody that was preparing the
5    process.
6        Q.    Okay.
7    A.    I couldn't tell you who it was.
8        Q.    I think we established earlier though
9    that it was not Countrywide at this point in the
10    process?
11    A.    Not at this point.
12        Q.    Okay. What evidence did you review
13    that indicated to you that Countrywide received
14    this form?
15    A.    From my understanding again and I don't --
16    absent the servicing agreement, the servicer
17    would provide a copy of the closing package,
18    typically.
19        Again, this is all spelled out in the
20    servicing agreement, so for me to sit here and
21    speculate it's not good. But, you know, in order
22    to setup the servicing of any loan you would need
23    to understand the parameters by which it was
24    closed. Even when you assume the servicing you
25    typically will ask for the initial documents. I
0147
1    mean, you want to protect your file, and for the
2    exact reason we're talking about today. But --
3        Q.    But my question is more direct in
4    terms of what evidence have you reviewed that
5    indicated Countrywide received an actual copy of
6    Exhibit A?
7    A.    I have no evidence, nor did I make a
8    statement that Countrywide received it.
9        Q.    And I'm not representing that you are.
10    A.    So there was never representation made
11    Countrywide received it.
12        Q.    How would your opinions change in this
13    case if it was proven that Countrywide never
14    received Exhibit A?
15    A.    If they didn't receive Exhibit A it could
16    possibly change the way I would look at it. But
17    then my next question would be, did they get any
18    of the insurance package? I mean, when they
19    setup the insurance typically to setup the
20    insurance escrow and operate as a servicer you
21    would have the insurances.
22        So again, if they didn't have this form
23    that could alter it, along with possibly that
24    there was no other documentation. But that
25    possibly could change it. But this is -- this
0148
1    was put in because it was support of the HUD-1,
2    which was the one pointed to.
3        Q.    How would your opinion change if it
                                Page 61

Alexander vs Countrywide Home (final).txt

4   was proven that Countrywide did not receive a
5   copy of Exhibit A?
6   A.    It could possibly change my opinion.
7         Q.   How is my question?
8   A.    My next question would be is then, you
9   know, why?  Why didn't they receive it?  Number
10  one.  And if the VA were so adamant at closing on
11  their own loan to require my client, in this case
12  it was my client, the borrower, to have
13  insurance, why didn't they pass that information
14  on?  That would be -- that's the way I would
15  approach it.
16        Q.   Okay.  And in looking at Exhibit B we
17  discussed earlier that there are some pretty
18  specific requirements regarding flood insurance,
19  right?
20  A.    Absolutely.
21        Q.   And these requirements are imposed
22  upon everybody in this process, as we've
23  discussed, the lender, the holder, the servicer,
24  everybody has an obligation in this whole
25  process, correct?
0149
1   A.    I would agree with that.
2         Q.   Okay.  Alright.  Isn't it true that
3   the Veterans Administration had an obligation, a
4   legal obligation to submit a copy of this form to
5   the servicer?
6   A.    I would say -- again, I'm not an attorney
7   so I am not going to speak to legal.  The normal
8   protocol would be that you should give this to
9   the servicer.
10        Q.   I mean, there are regulations that
11  require that?
12  A.    Absolutely.
13        Q.   Okay.
14  A.    So, yeah.  That was my contention.  You
15  know, absent it not being given to you then I
16  would have to say that the VA did not provide the
17  servicer with the proper information.
18        Q.   Okay.
19  A.    But again, the intent was that it was setup
20  at the closing from the inception in that
21  process.  So we try to talk within the process.
22        Q.   Okay.
23  A.    So if you can show the process was not
24  followed, then that would obviously change it.
25  But we've not been given any documentation to
0150
1   draw that conclusion prior to today you talking
2   about it.
3         If somebody was to give me documentation we
4   would have incorporated that into our discussion.
5   But we've not been given one document, other than
6   that closing from the VA, we've not been provided
7   any other VA supporting documentation at this
8   point.
9         Q.   Okay.  Exhibit B and B-1 to your
10  report are pamphlets.
11  A.    They're part of the guidelines, yeah.
12        Q.   Okay, that was my question.  Do you
13  know what forms the basis for these pamphlets?
14  Are you familiar with the regulations and
                                      Page 62

Alexander vs Countrywide Home (final).txt

15  guidelines that form the basis for these?
16  A.    I mean, they're really written differently,
17  I mean, you've got to go into them. I mean, you
18  talk about the regs, I can point to you, I can
19  probably tell you, you know, if I did a real
20  detail analysis I can tell you. But can I cite
21  the regs right now that pertain to this? No.
22          Q.    No, and I'm not asking you to.
23  A.    Please don't. I will be more than happy to
24  go get the...
25          Q.    Are you familiar with any VA
0151
1   regulations that relate to the National Flood
2   Insurance Act?
3   A.    Again, I know they have National Flood
4   Insurance Act, and I know there's a whole slew of
5   them. But again, from a lender's perspective
6   that would not be something that I would want to
7   give an opinion on, because I don't really go to
8   that direction, you know, I don't go into that
9   area.
10          I can go into more toward when it's
11  required, how it's escrowed, why we have flood
12  insurance, how the flood insurance cost is
13  arrived at.
14          But as far as the National Flood Insurance
15  Protection Act, or the National Flood Insurance
16  Program, whatever it is, I mean, isn't it pretty
17  thick, actually, the whole law on it? I couldn't
18  speak to it.
19          Q.    Okay.
20  A.    Nor would I want to.
21          Q.    The VA regulations and pamphlets that
22  you've attached to your report, are you aware of
23  any penalties that are assessed by virtue of any
24  violation of these guidelines or regulations?
25  A.    No, I'm not aware of, I'm not aware of. My
0152
1   only concern was what the guidelines would be the
2   guaranty.
3           Q.    Right. And we've discussed that.
4   A.    That's my biggest concern.
5           Q.    Okay.
6   A.    Would be to leave the guaranty.
7           Q.    But other than that you're not aware
8   of any penalties?
9   A.    Not that I'm aware of.
10          Q.    Okay.
11  A.    Well again, from an insurance I can tell
12  you there's so many regulations on banks. I
13  mean, I just want to be clear that there could be
14  a penalty not associated with this particular
15  situation.
16          Q.    Okay.
17  A.    Because I've been part of those people,
18  I've been penalized, I've received a penalty in a
19  situation, so I know they exist for not having
20  insurance. For this specific type of insurance,
21  no. But the one instance that mine came up was
22  because there wasn't insurance on a building.
23          Q.    Okay. Just so we're clear, my
24  question is only involving these that are
25  attached to your report.
                                    Page 63

Alexander vs Countrywide Home (final).txt

0153
1   A.   Not that I'm aware of specifically for
2   this.
3          Q.   Okay.  And I think you answered this
4   question, but the VA, do you know if the VA has
5   revoked the loan guaranty of the Alexanders'
6   loan?
7   A.   I have no idea.
8          Q.   Okay.  Are you aware of any
9   agreements, written agreements in place between
10  Countrywide and the Alexanders?
11  A.   No.
12         Q.   Okay.  Typically there would not be
13  such a written agreement, would there?
14  A.   Um, they might be required to have, like,
15  gotten some documents signed as the servicer, but
16  not that I'm aware of.  The agreement is with the
17  VA.
18         Q.   Alright.  Typically the servicer
19  agreements are with the holder or the VA?
20  A.   With the holder, exactly, yes.
21         Q.   Okay.  A servicer -- well, is a
22  servicer required to actually maintain premium
23  payments for flood insurance, or do they simply
24  have to ensure that those payments are made?
25  A.      The servicer's responsibility is to make
0154
1   sure -- again, the servicer's responsibility is
2   to make sure they're maintained.  And again, this
3   would be spelled out in any agreement.  But they
4   can do what they call force place insurance.
5          Q.   Right.
6   A.   And this isn't much a dispute, because
7   usually when it's forced placed it's four times
8   the cost of the original insurance, but that's
9   another debate for another day.
10         But typically there would be a provision in
11  there that allows them to go out and secure
12  insurance absent the person not meeting the
13  obligation.
14         Q.   Right.  And just to use this case as
15  an example of my question, Countrywide, lets say,
16  has the obligation as a servicer to ensure that
17  insurance premiums are being paid, correct?
18  A.   Correct.
19         Q.   Okay.  When those payments are not
20  made, for whatever reason, the servicer does not
21  typically go to the same insurance company that
22  the borrower is using to pay the premiums, do
23  they?
24  A.   No, no, typically not.
25         Q.   Okay.  Typically they go to their
0155
1   provider?
2   A.      Yeah, I think in Countrywide's case it's
3   Balboa, or whatever, but Countrywide has an
4   insurance company they use.
5          Q.   So in this case Countrywide had no
6   real duty to pay the premiums to Allstate on the
7   Allstate policy itself, did they?
8          MR. GIBSON:  Objection to form.
9   A.   They had the -- to actually pay them,
10  again, this was -- I'm going to go to my previous
                        Page 64

Alexander vs Countrywide Home (final).txt

22  flood zone you need to get at what level the
23  water table will impact the property.  And
24  depending on what they determine what
25  classification drives your premium, the more
0158
1   severity obviously the more premium.  So this is
2   a way of trying to determine what level --
3        Q.   Okay.
4   A.   -- impact that you would be in.
5        Q.   If I could direct your attention there
6   to the top there, I think there is a map number,
7   do you see that, very hard to read, I will try to
8   point.
9   A.   I know where you're talking about.
10       Q.   Yeah.
11  A.   Okay.
12       Q.   See this general line across here,
13  there's some data in that range, it appears to be
14  a map number.
15  A.   Okay.
16       Q.   And then it has the different criteria
17  date there, do you see that?  Date?  Let me just
18  point instead of sitting here asking you.  It
19  looks like 1988, but you tell me if you think
20  that's correct?
21  A.   I --
22       Q.   I assume that to be the --
23  A.   I assume it to be what the document, we'll
24  assume it looks like that date.
25       Q.   I mean, these guys looked at a map,
0159
1   right --
2   A.   Yeah.
3        Q.   -- to determine whether or not the
4   property is in a flood zone?
5   A.   Well, but then they typically go to the
6   properties too, from what I understand, they
7   actually do a survey of the property, from what I
8   understand.  I mean, I'm not a surveyor.
9        Q.   Okay.
10  A.   But it usually typically costs about three,
11  $400.  So if they were looking at just a map I
12  don't think they would charge three or $400.
13       Q.   Lets go off the record.
14            (Discussion off the record was had.)
15       Q.   So this document was prepared, I take
16  it, in connection with the Alexanders' closing?
17  A.   Yes, this was the document that was
18  prepared.
19       Q.   Do you have any evidence that Exhibit
20  C was ever given to Countrywide?
21  A.   No.
22       Q.   Okay.  On Exhibit C what is the
23  elevation or the zone, I take it, can you tell?
24  A.   Yeah, that's the A-11.
25       Q.   A-11?
0160
1   A.   Uh-huh.
2        Q.   Okay.  And I think your Exhibit C-1
3   specifies the different types of zones?
4   A.   Yeah, I put that in for convenience so that
5   you would have it available.
6        Q.   Okay.  Did you get this off the
                              Page 66

Alexander vs Countrywide Home (final).txt

18  surveyor to be able to interpret it a lot better
19  though.
20       Q.    Okay.
21  A.    Do you know when this was last updated?
22  This was updated -- this was last determined in
23  '96.
24       Q.    Uh-huh.
25  A.    And this was determined in 2001 by the land
0163
1  surveyor.
2       Q.    Uh-huh.
3  A.    So the way floodplains work, the topography
4  changes, so again --
5       Q.    Yeah, but they're looking at the same
6  map, aren't they?
7  A.    They're looking at the same map.  But
8  again, this is done, you know, six years earlier.
9       .Q.    Right, okay.
10  A.    But I'm not trying to support what this
11  guy, but, you know, two people could look at it,
12  but it's two different periods of time, and
13  things change over the period of time.  I mean,
14  property that was at one time not in a flood zone
15  becomes in a flood zone and vice versa, so...
16       Q.    And that's done through FEMA, isn't
17  it?
18  A.    Yeah.
19       Q.    Okay.
20  A.    Has FEMA update -- do they have an update
21  one from this determination, or this is the only
22  one they have?
23       Q.    That's not important.
24  A.    I'm sorry, I was just curious.  Thank you.
25       Q.    And the regulations regarding flood
0164
1  zone and the insurance that we've been discussing
2  clearly hinge on whether or not the property is
3  actually in a special flood hazard area, correct?
4  A.    Correct.
5       Q.    Okay.  Lets go off the record just a
6  second.
7              (Discussion off the record was had.)
8       Q.    Back to your exhibit HUD-1 form, I
9  think it was Exhibit D?
10  A.    Exhibit D.
11       Q.    Exhibit D is two pages, correct?
12  A.    Correct.
13       Q.    Do you know whether or not Countrywide
14  ever received page two of Exhibit D, have you see
15  any evidence one way or the other?
16  A.    No.
17       Q.    Okay.  On page two of Exhibit D the
18  two premiums that were paid, and we talked about
19  the flood insurance premium, do you know who paid
20  or who the insurer was for the hazard insurance
21  payment premium on Exhibit D?
22  A.    At closing?
23       Q.    Yes.
24  A.    Um, I believe they were -- I think it was
25  -- I get so confused with these.  I believe it
0165
1  was, um, lets see.  I know the flood was State
2  Farm.  I believe, was it Allstate on the hazard?
                    Page 68

Alexander vs Countrywide Home (final).txt
3   I really didn't focus too much on the hazard.
4        Q.   Okay.  If you're not sure that's fine.
5   A.   I'm not sure, so I'd rather not state.
6        Q.   Okay.  Flipping back to page four,
7   first paragraph, that last sentence where you
8   refer to the flood insurance.
9   A.   Uh-huh.
10       Q.   Doesn't that sentence assume that the
11  VA gave Countrywide a copy of the notice that we
12  looked at in exhibit, I believe it's Exhibit A?
13  A.   Yeah, that would be reasonable to conclude,
14  yeah.
15       Q.   Okay.
16       MR. GIBSON:  What sentence are we
17  talking about?
18       MR. HEMBREE:  Last sentence of the
19  first paragraph.
20  A.   Yeah.
21       Q.   Okay.  I mean, obviously they couldn't
22  be held responsible if they did not receive the
23  proper notice from the VA, correct?
24       MR. GIBSON:  Objection to the form.
25  A.   I'm not sure of the servicing agreement,
0166
1   but I would tend to, you know.  Again, it would
2   be spelled out very specific in the service
3   agreement.  But if they didn't get it they
4   wouldn't.
5        Q.   Right, I mean, it would be hard to
6   hold them accountable?
7        MR. GIBSON:  Objection to form.
8   A.   Right, to hold them accountable.
9        Q.   I mean, Countrywide is entitled to
10  notice that the property is in a special flood
11  hazard area, right, as a servicer?
12  A.   Yeah, because that would help them in order
13  to protect the collateral.
14       Q.   Right.  Services are typically not
15  required to perform flood cert determinations,
16  correct?
17  A.   Servicer would not make a determination as
18  to flood, that would be a lenders determination.
19       Q.   Okay.  And I think we've covered this
20  earlier about the National Flood Insurance Act,
21  you're really not familiar with it at all?
22  A.   Not at all.
23       Q.   Okay.  And you're not familiar with
24  any penalties that are imposed by the National
25  Flood Insurance Act?
0167
1   A.   I have no knowledge.
2        Q.   Okay.  In your analysis of the
3   payments made by the Alexanders in this case did
4   you find any evidence that Countrywide collected
5   any sums in the escrow account for flood
6   insurance?
7   A.   You know, unfortunately the documentation I
8   was given there's a lump sum number for
9   insurance, like 1,780.  We tried our best to
10  manage, you know, so the numbers were all over
11  the place.  But specifically paid flood insurance
12  I wouldn't be able to tell you that Countrywide
13  paid it.  We just were trying to the best of our
                        Page 69

Alexander vs Countrywide Home (final).txt

14  ability because we saw 316 at closing, 1,780, you
15  know, and the numbers change, so... But
16  specifics of the payments, no, we were not
17  provided. So I would say I can't say whether
18  Countrywide ever paid flood insurance.
19       Q.   Okay. Did they ever collect money
20  from the Alexanders for flood insurance?
21  A.    I don't know that to be the case. Except I
22  know that there was money collected for
23  insurance. I don't know as to what the
24  collection was for.
25       Q.   Okay.
0168
1  A.    So I just want to be clear that I know they
2  collected insurance money, I can't speak as to
3  what the insurance money was for.
4       Q.   And you bring up an interesting point
5  in terms of the hazard premium, there was a
6  drastic difference in the second year, right?
7  A.    Correct.
8       Q.   Okay. Could the first year payment or
9  the PLC payment that we looked at on the HUD-1,
10  could that have been just for a couple of months?
11  A.    Typically I don't think they would do that.
12  I mean, typically the servicer needs that breath
13  of the year so that it can collect the next round
14  of payments.
15       Q.   Uh-huh.
16  A.    That would be typically the way it would
17  normally work. So that would not be typical to
18  pay only a small portion of the thing. Because
19  then the servicer wouldn't have the ability to
20  generate the next year premium. That's design.
21       The same thing with the reason why
22  sometimes you take four months taxes, because the
23  payment you wouldn't have enough payments before
24  the next quarter taxes come up to protect your
25  two months. So again, that's not typical.
0169
1       Q.   Right. And whatever the determination
2  was made it was made at closing, correct?
3  A.    Correct.
4       Q.   So it would have been made by the
5  lender, not the servicer, in terms of how much to
6  put into escrow?
7  A.    Correct.
8       Q.   Okay. The paragraph three on page
9  four mentions the term good banking practices?
10  A.    Yeah, what as a bank and anybody involved
11  in the lending transaction it would be good bank
12  practicing always to preserve the collateral and
13  ensure the collateral. That's just best
14  practices, I mean, that's what that's kind of
15  talking about.
16       Q.   Okay. Who was acting in a banking
17  capacity, who are you referring to as acting in a
18  banking capacity?
19  A.    Well, banking has the umbrella of
20  everybody, banking has servicer, has lender, it's
21  kind of one big blanketed practices. And the
22  reason that the servicer gets dragged in is it's
23  like emphasized to him at all costs preserve the
24  capital.

Page 70

Alexander vs Countrywide Home (final).txt
25        An example is don't let the taxes get out
0170
1    of control, because we all know taxes take a
2    first lien position prior to even our secured
3    credit.  So it's kind of like in our mind it's
4    like one big family if our servicer.
5        And I can tell you as a lender when my
6    servicer doesn't do a good job my clients are all
7    over me, I mean, they're like all ready to hang
8    me.  So it's kind of like when I say -- when we
9    say that it's just obviously we're always looking
10   to preserve the capital -- I mean, the
11   collateral, I apologize, the collateral.
12        Q.    Okay.
13   A.    So that's what I'm referring to.
14        Q.    Okay.  Is there a group or entity that
15   determines what these good banking practices are?
16   A.    Yeah, you can go there's like the FTC will
17   put out things like the Federal Trade Commission
18   will have guidelines, and, you know, you have
19   RESPA, you know, you have different agencies that
20   will give it to you.  Most somebody the size of
21   Countrywide probably has a SOP on this, a
22   standard operating procedure.
23        Q.    Uh-huh.
24   A.    Which would be another document I would
25   like to see is what is the standard operating
0171
1    procedure of the servicer, somebody of this
2    magnitude, which is electronic.  There's all
3    different standard operating procedures.  But I
4    can tell you one of the major concerns we come
5    across is the preservation of the collateral, and
6    the only way to do that ensure that is through
7    the insurance itself.
8        Q.    Okay.
9    A.    Again, like you keep emphasizing if they
10   didn't get it then obviously that would be a
11   reasonable point.
12        Q.    And you anticipated my next question.
13   This statement assumes that Countrywide received
14   the notice that's set forth in Exhibit A to your
15   report?
16   A.    Right.  And knowing -- and the reason why
17   we would state something like this is the VA is
18   so procedural, it would be very surprising for
19   them not to have followed a procedure.  You know,
20   they really don't offer latitude, you know,
21   that's the basis on my experience.
22        Q.    On Exhibit E to your report --
23        MR. GIBSON:  E as in?
24        Q.    Edward.
25   A.    We're talking about the Allstate flood for
0172
1    the period of 3/8/03 to 3/8/04, is that the one
2    we're talking about?
3        Q.    Yes.
4    A.    Alright, I have that page.
5        Q.    Who is listed as the first mortgagee
6    lender name?
7    A.    I apologize.  Oh, the Veteran Farm and Home
8    Board.
9        Q.    Okay.
                          Page 71

Alexander vs Countrywide Home (final).txt
17    our point.
18        Q.   Okay.
19    A.    The other question I have is if Countrywide
20    didn't know it needed flood insurance, why did
21    they send this letter?
22        Q.   Well, and you may not have reviewed
23    the notes regarding the calls from the borrower,
24    the Alexanders to Countrywide during this time
25    frame, were you aware that they called about this
0180
1     time to check on their flood insurance?
2     A.    When was the first call?
3         Q.   December of 2005.
4     A.    Okay, so okay.
5         Q.   So you were not aware of that
6     telephone conversation?
7     A.    Was I aware?  Was I aware?  I don't
8     remember talking about that.  It might have been
9     mentioned something happened after the fact,
10    yeah.
11        Q.   Okay.
12    A.    I think it was after the fact.
13        Q.   Okay.
14    A.    I would just be curious as, like, how did
15    they know the determination was not in a flood
16    zone?  So, you know.
17        Q.   Right.  It's odd, isn't it?
18    A.    And you've got a loan that says it's a
19    flood zone, so it was odd.
20        Q.   Right.
21    A.    That's odd.
22        Q.   But if the borrower had called to
23    complain, wouldn't it be reasonable to check and
24    see if it was in a flood zone?
25    A.    But I'm not sure if I'm Countrywide
0181
1     servicing a VA loan that I would tell the
2     borrower that you're not in the flood zone
3     without getting the VA to tell me that.
4         Q.   Okay.
5     A.    You know, because the VA documents
6     contradicted what they told the buyer.
7         Q.   Do you know whether or not Countrywide
8     contacted the VA?
9     A.    I don't know that.
10        Q.   Okay.  The top of page five.  It would
11    be a reasonable banking practice to perform a new
12    elevation survey given the elevation survey that
13    was provided at closing of the loan showed the
14    flood hazard.
15            So I take it then by virtue of exhibit
16    number eight Countrywide did comply with
17    reasonable banking practices by having this
18    Exhibit 8 done?
19    A.    If they went out and did a survey and
20    protected themselves, absolutely.  But again,
21    that document was not included --
22        Q.   I understand.
23    A.    -- in what I saw.
24        Q.   I understand.
25    A.    But again, I caution that would be
0182
1     something you would want to make sure the person
                    Page 75

Alexander vs Countrywide Home (final).txt

2  you were servicing agreed with it. So I would
3  probably before I would send a letter telling
4  someone they don't need flood insurance as a
5  servicer, we would typically want the lender to
6  be the person that did it. Because then we
7  clearly would not have any responsibility,
8  because it would be them telling them. But
9  you're saying it's after, so...
10        Q.   Okay. And you testified earlier that
11  you don't have any idea what the agreement was
12  between Countrywide and the owner?
13  A.    I've never been provided a service
14  agreement between the two.
15        Q.   All right. Okay. On page five there
16  at the bottom you get into Exhibit G.
17  A.    Yeah, we talked about that earlier.
18        Q.   Right. And this is regarding again
19  the application of insurance proceeds, right?
20  A.    Well, yeah, this was -- this is what we
21  went through, we specifically spoke about this.
22  This is the way the deed of trust, and thank you
23  for having your mag -- your glass here.
24        Q.   Right.
25  A.    And lets not confuse it, I don't see this
0183
1  as insurance proceeds, I see this as money being
2  paid down on the loan. Maybe that will clarify
3  it. After you apply it to whatever allowable
4  costs, which are spelled out in that little
5  unreadable section in our copy. So that's the
6  way I interpret it, and that's the way I'm
7  presenting it.
8        Q.   And I understand you're trained as an
9  accountant and you do look at your numbers, I
10  understand.
11        Now on Exhibit G, which is attached to
12  your report as Exhibit 1, if you can flip over to
13  Exhibit G.
14  A.    Yeah. Okay. Do I get to use my magnifying
15  glass now?
16        Q.   This is readable.
17  A.    Okay.
18        Q.   Up there at the top there's some
19  underlined sections on my copy, is it
20  underlined --
21  A.    Yes.
22        Q.   -- on yours, do you see that?
23  A.    Yeah, restoration.
24        Q.   All policy payments received for
25  insurance losses must be applied to the
0184
1  restoration of the security or the loan balance.
2  Do you see that?
3  A.    Correct.
4        Q.   Okay. And is that your understanding
5  of what the regulations are?
6  A.    Yes, it is.
7        Q.   Okay.
8  A.    Regarding hazard insurance we're talking
9  about. This is on the hazard insurance.
10        Q.   Correct. Which wind and water would
11  qualify as a hazard insurance, would it not?
12             MR. GIBSON:  Objection to form.
                   Page 76

Alexander vs Countrywide Home (final).txt
13  A.      They're specific hazards, but each one does
14  a different thing.  But I'll accept it as that,
15  yeah, typically it would fall under the same
16  guidelines, but, yeah.
17          Q.    I think even in this case if we were
18  talking about if there had been flood insurance,
19  for instance --
20  A.      Right.
21          Q.    -- I mean, this would be applied the
22  same way, correct?
23  A.      Right.  Typically the protocol that I've
24  seen, and again I'm not an insurance expert, is
25  they'd pay off the loan balance first and then
0185
1   they'll redo the loan.  That's the way I've seen
2   it happen in a disaster, but it could be
3   different in different states.
4           But that's why I think they give you the
5   flexibility.  If the disaster wasn't bad enough
6   and you could restore it they give you the option
7   to restore it.  But if it's a total disaster then
8   I think it has to go to the loan balance.  But
9   again, this would be spelled out in a servicing
10  agreement.
11          Q.    And it's the lender's option in that
12  case, isn't it?
13  A.      It's the lender's option in that case?
14          Q.    As to whether it goes to the
15  restoration or the balance of the loan?
16  A.      It's the option of the lender, correct.
17          Q.    Okay.
18  A.      Unless it's spelled out in the servicing
19  agreement.  Okay, because they do usually spell
20  things out, it's crazy.
21          Q.    Okay.  On page five of your report you
22  talk about the real estate taxes and being
23  reduced.  What were you discussing there?
24  A.      What happens typically is when there's no
25  dwelling left now you're talking about vacant
0186
1   land until you get a structure back on it.  And
2   typically the value of the real estate would
3   went down significantly because it's destroyed,
4   you don't have the dwelling on it.  And we all
5   know when you look at the assessed value most of
6   the assessed value is the structure and the land
7   is usually much, much lower.  So and during
8   typically any kind of natural disaster there's
9   some type of forbearance usually with the taxes
10  and stuff like that.  But I would think my
11  understanding there was no structure there.
12          Q.    Okay.
13  A.      I don't think the structure has been
14  replaced.  I don't even know who owns the
15  property at this stage of the game.  But if the
16  structure wasn't there there would definitely be
17  much less real estate taxes, you would go into
18  the tax appeals office and say I don't have a
19  dwelling, how could you tax me based on this when
20  I can't live there, and, you know, so forth.
21          Q.    Are you familiar with the way
22  Mississippi assesses real property for taxation
23  purposes?
                        Page 77

Alexander vs Countrywide Home (final).txt
```
24  A.    Not specifically Mississippi.
25        Q.    Do you know whether anything was done
0187
 1  improperly in this case regarding the real estate
 2  taxes?
 3                MR. GIBSON:   Objection to form.  By
 4  whom?
 5        Q.    By anyone?
 6  A.    I don't think in my statement I go to that.
 7  I just go to the, you know, that the taxes should
 8  have been reduced.  I think I just speak to that
 9  the taxes on a tax basis, I'm not sure.
10        Q.    Okay.  So you're not saying
11  Countrywide was doing anything improper in
12  connection with the real estate taxes on the
13  Alexanders' property, are you?
14  A.    Other than that there might -- if under the
15  provisions of the workout, or whatever under the
16  circumstances in the disaster we would be in a
17  workout mode in looking for a reduction in taxes
18  as a servicer.  Because I believe, again, if I
19  had the service agreement, I believe Countrywide
20  would be the workout person in this instance for
21  the VA.
22        Q.    Uh-huh.
23  A.    So I would think that things like that like
24  taxes would have been less and things like that.
25  So other than just providing information as a
0188
 1  servicer, if there was the opportunity for it.
 2  So not that it's done, you know, maliciously or
 3  anything, you would have thought there would have
 4  been more of a workout type thing going on.
 5        Q.    Okay.
 6  A.    That's, I think, more corrective of what we
 7  were referring to in that.
 8        Q.    Okay.  Do you know whether or not any
 9  such workout occurred by Countrywide or anyone
10  else?
11  A.    Again, just strictly numbers, we were
12  reviewing payments.
13        Q.    Uh-huh.
14  A.    So based on numbers I didn't see that.  And
15  I have not been provided anything on or strictly
16  specifically based on the review of the payments
17  that confirmed that taxes were not being paid,
18  insurance were not being paid, you know, at this
19  stage so.  And I'm sure there was something going
20  on, but we weren't provided.
21        Q.    Okay.  And I will represent to you
22  that Mississippi taxes are assessed in arrears,
23  and it's a little different in that changes that
24  occur are delayed for typically a year.  So that
25  could explain some of the numbers you've looked
0189
 1  at.
 2  A.    Okay.
 3        Q.    But as long as you're not indicating
 4  that Countrywide did anything I am not going to
 5  question you.
 6  A.    I think other than that, you know, the
 7  numbers would have went down and mitigated the
 8  balance I'm not -- I don't think I --
```

Alexander vs Countrywide Home (final).txt

```
9          Q.   Okay.
10  A.      -- went that direction.
11          Q.   Were you aware that Redditt Alexander
12  declared bankruptcy in 2006?
13  A.      I believe, yes, I am.  But I have not seen
14  any of the bankruptcy papers or been involved in
15  any of the bankruptcy papers.
16          Q.   Okay.  What impact does this have on a
17  lender when the borrower takes bankruptcy, how
18  does that impact the communications between
19  lender and borrower?
20  A.      Well it typically changes it, that's for
21  sure.  But I believe the trustee would act on
22  behalf of the bankruptcy.  How it impacted,
23  again, that communication may slightly change,
24  and I would hope it would be better, but I don't
25  know.
0190
1          Q.   Okay.
2  A.      I think the trustee becomes more where the
3  bank has to go to the trustee.
4          Q.   Okay.  Would that create a delay,
5  perhaps?
6  A.      Would that create a delay?  No, because the
7  whole purpose of the bankruptcy I think is to
8  actually expedite and clarify.  I don't know that
9  it -- it would cause a delay in the ability to
10  foreclose, that's for sure, it would definitely
11  cause a delay on that.  If you give me a specific
12  delay I can tell you whether or not.  But
13  typically it would delay the ability for the
14  lender to take the house away.  But in this case
15  I don't believe there was a house.
16          Q.   Okay.  Have you reviewed any evidence
17  concerning the intent of the Alexanders to
18  rebuild their property?
19  A.      No, I have not.
20          Q.   Okay.  Have you reviewed any
21  information regarding the Alexanders' application
22  for a grant through the Mississippi Development
23  Authority?
24  A.      No, I have not.
25          Q.   Were you aware that they applied for a
0191
1  grant?
2  A.      No, I was not.
3          Q.   Okay.  And the last sentence on page
4  five you're referring to relief, you're saying
5  that relief would be provided, is this the tax
6  discussion we just had?
7  A.      Yeah, that was in the tax.
8          Q.   Okay.  The relief you're referring to
9  is the tax?
10  A.      We're talking you know --
11          Q.   Okay.
12  A.      -- it would be reasonable to conclude if
13  there's no structure that there would be some
14  kind of moratorium, I think.
15          Q.   Okay.  Page six on your report in
16  Exhibit 1 gets into your opinion.
17  A.      Uh-huh.
18          Q.   Are you aware as to why the flood
19  insurance of the Alexanders was canceled?
```

Page 79

Alexander vs Countrywide Home (final).txt
20   A.    Was I aware of why?  Other than speaking to
21   the documents, not the exact reasons why.
22          Q.    Uh-huh.
23   A.    I'm not sure why exactly.
24          Q.    They had an insurance policy with
25   Allstate, right, a flood insurance policy?
0192
 1   A.    Right.
 2          Q.    And it was canceled?
 3   A.    Okay.
 4          Q.    Okay.  Are you aware of why it was
 5   canceled?
 6   A.    My guess would be probably no payment,
 7   right?
 8          Q.    Okay.
 9   A.    I'm aware of obviously -- I'm aware of it
10   being canceled, so there has to be a reason why
11   it's canceled.
12          Q.    Okay.
13   A.    But as far the details of why it was
14   canceled and how the cancelation came about I
15   don't know those details.
16          Q.    Okay.  In paragraph two there on page
17   six, you reference again the elevation
18   certificate in Exhibit F, which is the letter we
19   covered, and you mentioned that there could be
20   fines.
21   A.    Yeah, on a regulatory review.
22          Q.    Right.  But now in this case since
23   there was a certificate done there in Exhibit 8
24   there would be no fines, right?
25   A.    Again, if you had a document supporting
0193
 1   your position, no, it would not be.
 2          Q.    Okay.
 3   A.    But again, the document wasn't provided at
 4   the time of the report.
 5          Q.    I understand.  And again, you're not
 6   aware of any fines that have been assessed
 7   against Countrywide as a result of the
 8   Alexanders?
 9   A.    No.
10          Q.    Okay.  In the second sentence in
11   paragraph three you state that Countrywide was
12   responsible to ensure that flood insurance as
13   well as all insurances were in place.
14          And in regard to the flood insurance
15   now, this statement again assumes that
16   Countrywide received a copy of Exhibit A, does it
17   not?
18   A.    As well as the fact that the precedent in
19   the original return the HUD-1 that there was
20   flood insurance.
21          Q.    Okay.
22   A.    So that document plus the fact of the
23   HUD-1.
24          Q.    Okay.  Now the flood insurance is only
25   mentioned on page two of the HUD-1, correct?
0194
 1   A.    Page two of the HUD-1.
 2          Q.    Right, okay.  And that assumes that
 3   Countrywide received a copy of page two?
 4   A.    Yeah, or some correspondence from the VA in
Page 80

Alexander vs Countrywide Home (final).txt

```
 5  some form, yeah.
 6        Q.    Have you had any experience with the
 7  handling of the loan packages after the closing
 8  of the loan?
 9  A.    Yes, I have.
10        Q.    How are the closing documents handled
11  after the closing of the loan, what happens to
12  those closing documents?
13  A.    There are certain documents that are just
14  like the Bible, the original note, and certain
15  documents that are just like you have to be very,
16  very, very careful with.
17        Typically, you know, the closing agents are
18  not always the best ones to get you back all of
19  the documentations timely, so we're usually
20  chasing them down.  And in the new technology
21  there's more scanning so we're able to find the
22  documents.
23        But typically the package is sent out to a
24  closing agent, I'm not sure how they do it when
25  they did it at the VA, but in the regular world
0195
 1  they typically send out documents, you make sure
 2  all of them are signed and properly documented.
 3  And then you pull out the specific documents that
 4  are required of the VA to ensure your VA
 5  guaranty, and you send them to the VA.  And then
 6  the VA gives you back things saying we will
 7  insure the loan, here's your guaranty, you know,
 8  as, you know.
 9        Q.    Okay.  Have you ever conducted an
10  audit or are you familiar with the audits that
11  are conducted by servicer's of loan files when
12  they receive them?
13  A.    This is going back a while, but usually,
14  like I said, they have procedures on what they
15  require.  And again, this is all spelled out in
16  the service agreement.
17        Q.    Okay.
18  A.    In order for them to be responsible you
19  have to provide them this, this and this.  But
20  they're typically they want to see the note, the
21  mortgage, they want to see, you know, the escrows
22  and the insurance policies and all of the things
23  so forth.
24        Q.    Okay.
25  A.    So I've seen the packages.  Have I audited
0196
 1  them in recent?  No, but I can tell you pretty
 2  much what's in them.
 3        Q.    Okay.
 4  A.    And I can also tell you what's spelled out
 5  in their agreements.
 6        Q.    Okay.  But you're not familiar with
 7  the standards used by auditors of servicer's, are
 8  you?
 9  A.    As regards to the documentation that's
10  given to them?
11        Q.    Yes.
12  A.    No.
13        Q.    Okay.  You attached a document marked
14  D-5 to your report?
15  A.    D-5.
```

Page 81

Alexander vs Countrywide Home (final).txt
1   D-5, the force place?
2   A.    Again, very simply stated, it's just to
3   show that there's force placed.  You know, if
4   there was flood we could have done the same thing
5   for flood, that was really the gist of that
6   point.
7         Q.    Okay.  And I think I understand.  I
8   just wanted to make sure that you're not saying
9   that, you know, like we talked about earlier
10  there was an initial premium for $300 and then we
11  had the 1,500, that should not have triggered
12  anything, should it?  I mean, that's not what
13  you're saying, right?
14        MR. GIBSON:  Objection to the form
15        triggered anything.
16        Q.    Any duty on the part of Countrywide to
17  take any action?
18  A.    I was showing that Countrywide had the
19  ability to take the action.
20        Q.    By force placing the insurance?
21  A.    By force placing insurance.
22        Q.    Okay.
23        (A short break was taken.)
24        Q.    Okay.  Back to page six of the report,
25  which is Exhibit 1, fifth paragraph, the original
0200
1   elevation survey indicates that flood insurance
2   was acquired, the VA documentation flood
3   insurance and the policy being in place since
4   2002 without any problems shows Countrywide's
5   escrow division made a mistake.
6         Those two statements assume that
7   Countrywide knew about the elevation certificate,
8   correct?
9   A.    Correct.
10        Q.    Okay.
11  A.    Or the lender made Countrywide aware of
12  those requirements.
13        Q.    Okay.  Have you discussed any of these
14  events with anyone from Countrywide?
15  A.    No.  I specifically would never do that,
16  because I deal with some on other levels I would
17  not disclose.
18        Q.    Okay.
19  A.    This has not been discussed with
20  Countrywide.
21        Q.    Have you discussed any of these
22  matters with the Alexanders?
23  A.    No.
24        Q.    Okay.  You say that Countrywide was
25  monitoring the escrows account and should have
0201
1   seen that flood insurance was not in place?
2   A.    Yeah, typically on the RESPA you're
3   required to go on an annual basis to go over
4   completely, provide the client with a full
5   accounting of the year.
6         Q.    Uh-huh.
7   A.    And that would typically show the client
8   all of the insurances, the taxes, how they were
9   dispersed, that's required.  So when I say
10  monitoring, that's the monitorization that's
11  required, that's not negotiable.
                                        Page 83

Alexander vs Countrywide Home (final).txt

12      Q.   Right.
13  A.   They have to provide an annual.
14      Q.   Are you assuming there again that
15  Countrywide had the flood elevation certificate?
16  A.   And/or they had been given the proper
17  documentation to know about it.
18      Q.   Okay.  And you're not saying that they
19  didn't monitor the escrow account and give the
20  Alexanders an accounting, are you?
21  A.   I'm assuming they did.
22      Q.   Okay.
23  A.   Because it's required, I would imagine them
24  to be in compliant with that.
25      Q.   Okay.
0202
1   A.   Because if you weren't, you know, that
2   would lead to something.
3       Q.   Okay.  I mean, if they didn't have the
4   notice from the VA or the flood elevation
5   certificate Countrywide wouldn't have been
6   looking for flood insurance, would they?
7   A.   If they were never provided with it?
8       Q.   Right.
9   A.   Correct.
10      Q.   Okay.  Top of page seven you state
11  that the actual flood insurance application,
12  which is D-1, clearly indicates that the
13  mortgagee as the VA care of Countrywide Home
14  Loans and as the servicer to be notified of the
15  cancellation of policy.
16  A.   Yeah, who's ever listed on that policy is
17  the one that's going to be notified.
18      Q.   Right.  But we saw earlier that the
19  policy itself had a different address than the
20  application, correct?
21  A.   The second policy?
22      Q.   The flood policy.
23  A.   Yeah, but that was the second one, not the
24  first one.
25      Q.   For Allstate, that's correct.
0203
1   A.   Right, so that's the second policy.
2       Q.   Right.
3   A.   This one refers to the first policy, that's
4   all.
5       Q.   Okay, so that you're referring to the
6   State Farm policy?
7   A.   Well, yeah.  What it is is that sets the
8   precedent that Countrywide had to be given notice
9   upon a cancellation.
10      Q.   Uh-huh.
11  A.   Now you're saying you asked me about the
12  second policy.  I never saw the second, the
13  second policy didn't have it on it is what your
14  statement was.  But the first policy did have
15  them on it.
16      Q.   Okay.  So you're talking about in that
17  statement then you're talking about State Farm?
18  A.   Right.  So I'm assuming that Countrywide
19  had knowledge of State Farm because they were
20  listed on the certificate.
21      Q.   On what certificate?
22  A.   The state -- I believe the application, and
                    Page 84

Alexander vs Countrywide Home (final).txt
23  I think it was the first certificate, if I'm not
24  mistaken.  The Allstate one, you know, I think
25  the application was State Farm.  And on the State
0204
1  Farm application and then I think we got
2  Countrywide Home Loan was the name, so that we
3  were speaking to the first one.  The second one
4  the address was wrong.
5         Q.  I see.
6  A.    So I'm saying yes to your second
7  application.  The first one so reading it as a
8  person reading a document I'm seeing the initial
9  application and the name of the servicer
10  correctly.
11        Q.  But you don't know when Countrywide
12  received a copy of the State Farm application, do
13  you?
14  A.    Well typically the insurance company would
15  be asking somebody for who the success -- how to
16  make the endorsement.  Somebody had to drive
17  that.
18        Q.  Uh-huh.
19  A.    And whoever drove that on the initial
20  application drove it to Countrywide's direction.
21        Q.  Uh-huh.
22  A.    Somewhere between the first one and the
23  second one it looks like that changed.
24        Q.  Uh-huh.
25  A.    Because it typically the requirement for
0205
1  the policy is, well, who do you want it to be and
2  it will tell you.  Like I said, the Department of
3  Veterans Affairs, or HUD and its successors.
4         So in the first one it looks to be like
5  Countrywide was correctly put onto that policy.
6  It was the second one that you brought to our
7  attention that appears to be a different address.
8         Q.  Right.
9  A.    So I agree with the second one.  But the
10  first one is the basis for what we're saying.  Is
11  if they were named on the first application and
12  involved in the first policy, according to what
13  the documents are saying, it would be reasonable
14  for us to conclude that they had knowledge.
15         Now if they didn't have that then that's a
16  different situation.  But we're speaking to the
17  documents, we're not speaking to whether or not
18  they got the documents.  It appears that the
19  application, whoever was preparing the
20  application knew Countrywide was the ultimate
21  person that was responsible to be notified on the
22  first application.
23        Q.  Right.
24  A.    So now if somebody didn't follow that
25  through to the second application then your
0206
1  statement would be accurate.  But that's what the
2  basis was for our opinion.
3         Q.  But Countrywide did not prepare the
4  first application to State Farm, someone else
5  did, correct?
6  A.    On the -- somebody else prepared the
7  application and somebody gave them the
                              Page 85

Alexander vs Countrywide Home (final).txt

8   instructions that Countrywide should be notified
9   if there was a problem.
10       Q.   And but that doesn't mean that
11  Countrywide was notified, does it?
12  A.   I don't know that.  No, I don't know that.
13       Q.   Okay.
14  A.   That's not what we said in our report.  Our
15  report has said that based on us seeing an
16  application at the inception of the loan name in
17  Countrywide it's reasonable for us to conclude
18  that they had knowledge.
19       If you have a document different than that
20  then I would yield to that.  But it was
21  interesting to find them on the application.
22       Q.   Right.
23  A.   That's where, you know, that's what we were
24  talking about.
25       Q.   And typically now the loan servicer
0207
1   does not get the loan origination documents as
2   soon as the loan comes in, do they?
3   A.   No.
4        Q.   It takes a while, doesn't it, to
5   circulate those documents?
6   A.   It does, yeah, it does in fact happen,
7   they'll sometimes be requesting additional
8   documents, yes, that's true.
9        Q.   Okay.  And on page seven of your
10  report second paragraph you state that:  If
11  Countrywide had properly serviced the Alexander
12  loan and maintained flood insurance there would
13  have been sufficient insurance proceeds to pay
14  off the loan balance.
15       How do you know there would have been
16  sufficient insurance proceeds to pay off the loan
17  balance?
18  A.   Because from my understanding the first
19  policy only covered the upstairs, and they
20  wouldn't have paid for the downstairs.  Because
21  typically the wind argue that I believe I think
22  from my recollection of the documents that the
23  wind limited the amount of damages that they
24  would cover, which I don't understand, it's
25  semantics of insurance, but the flood would have
0208
1   covered the certain aspects of the building.
2        And since we received the 86,000, and
3   technically I believe we only owe about 70, there
4   should be enough, I think they would have covered
5   the difference.  That's just, you know, based on
6   what I've seen in my experience, you know, that
7   would be reasonable.
8        And more importantly, I think if the flood
9   insurance was there clearly the VA has an
10  obligation to interject a guaranty.  So even if
11  the flood insurance didn't, and my major concern
12  still remains is that they don't argue that well
13  we didn't have flood insurance so they're not
14  going to file the guaranty.  But I think between
15  the guaranty and the insurance I think we would
16  have been enough to satisfy the loan, that's just
17  basically...
18       Q.   So you're making that statement based
                        Page 86

Alexander vs Countrywide Home (final).txt

19  on what the wind carrier did in its determination
20  of insurance coverage?
21  A.    And the fact that there's a guaranty and
22  then the other things.
23         Q.   Right, okay.  In terms of the
24  application of the insurance proceeds.
25  A.    Uh-huh.
0209
 1         Q.   What dollar amount do you contend that
 2  the Alexanders were damaged by Countrywide's
 3  actions regarding the application of the
 4  insurance proceeds?
 5  A.    And I have to be very cautious with that,
 6  damages are what you can -- it depends, in every
 7  jurisdiction they're different.
 8         MR. GIBSON:  Let me object.
 9         Q.   Well, how were the Alexanders injured
10  by this application of the proceeds?
11  A.    Because the loan hasn't been settled.  I
12  mean, there's still an outstanding loan against
13  them at this point.  I mean, I believe the VA
14  would have wiped out the bill.
15         Q.   No, you misunderstand my question.
16  A.    Okay.
17         Q.   I'm focusing on the $86,000 payment of
18  insurance proceeds, okay?
19  A.    Uh-huh.
20         Q.   How were the Alexanders injured by the
21  application of that $86,000?
22         MR. GIBSON:  Objection to the form.
23  A.    The dollar amount that they're pursuing is
24  larger than would have been pursued as a balance
25  if it was properly applied.
0210
 1         Q.   How much?
 2  A.    We gave a number, we believe that the
 3  balance should have been is at 70,000.
 4         Q.   And do you know what the balance is?
 5  A.    Well, we're going again by the documents
 6  that were provided to us, and in this document
 7  they're showing us still at 145,000, as of, you
 8  know, when we were going through this.  So
 9  they're showing us and therefore requiring us to
10  continue to pay our balance.  I mean, as of 2007
11  they're still showing us owing $145,000.  And
12  these are the documents that we've been provided.
13         Q.   Okay.  So how does that work
14  mathematically?  I mean, you have, what, a year's
15  worth of time there basically?  When were the
16  proceeds applied?
17  A.    They should have been applied, again give
18  and take 30 days depending on, but it looks like
19  the check was received in '06.
20         Q.   Right.
21  A.    And the whole -- my contention was the
22  balance is 145, how could it still be 1 -- you
23  know, because all they did was take that money
24  and just continue to pay the mortgage and keep
25  the mortgage in place.  So my argument is that 86
0211
 1  should have -- some of it should have went to
 2  taxes, whatever was behind, insurance in this
 3  case, and we have a principal balance.  But
                              Page 87

Alexander vs Countrywide Home (final).txt

15      So again, they're showing our balance in
16  the neighborhood of 140,000.  Logically it
17  couldn't be.  I mean, if you got a payment of 86
18  you couldn't have that much interest in that time
19  period.
20      Q.   Okay.
21  A.   So I think what happened is I think like a
22  typical servicer they will do like a reversal,
23  and it doesn't necessarily give effect to a lump
24  sum payment.  So we just did it as if it was...
25  and clearly under -- and you saw it today in the
0214
1   pamphlet and in the guidelines, it goes to
2   principal.  And then you're suppose to, because
3   of the circumstances, at that point come up with
4   a new amortization.  Because, like I said, that's
5   still being paced on $160,000 loan.
6       Q.   Uh-huh.
7   A.   Even though principal was paid down.  And
8   that's unfortunate.  When you're locked into a
9   30-year term you can make all of the principal
10  payments you want.  You can owe one years of
11  payments and they're not going to alter that
12  original note in payment.  And that's why we feel
13  the loan balance is less than it is right now.
14      Q.   So in calculating all of these figures
15  you're making the assumption that the lender
16  wants the insurance proceeds to go to the loan
17  balance as opposed to the restoration of the
18  property?
19  A.   The lender's documentation's saying the
20  national complete devastation that it goes to
21  reduce the balance and we'll give the guaranty.
22  I mean, they don't say that here's -- the money
23  went to Countrywide, from what I understand.  So
24  the money didn't go to the customer to restore
25  it.
0215
1       Q.   But now the deed of trust clearly
2   gives the lender the right to chose whether or
3   not the proceeds from any insurance policy goes
4   to the loan balance or to the restoration of the
5   property, correct?
6   A.   Right.  But in this case it went right to
7   the loan, there was no restoration.
8       Q.   Did it go right to the loan?
9   A.   Well according to this document it didn't.
10      Q.   Right.  And who determined that it
11  didn't go right to the loan?
12  A.   I'm guessing the servicer in communication
13  with the lender, but we have not been privy to
14  those documents.
15      Q.   Okay.  So the servicer or the lender
16  was acting in conjunction with the deed of trust
17  in making a determination, was it not?  I mean,
18  shouldn't the servicer or the lender have the
19  right to look and examine the situation,
20  determine whether or not they were going to apply
21  the deal, the insurance proceeds to the loan
22  balance or restoration of the property?
23  A.   But again, they took the lump sum money and
24  they kept it.
25      Q.   Uh-huh.
                        Page 89

Alexander vs Countrywide Home (final).txt

0216
1   A.    They didn't give the money back.  If they
2   gave the money back to the Alexanders then your
3   theory is right.  But they hold the money.
4         Q.    Well the only case they would have
5   given it back to the Alexanders would have been
6   if they were going to actually restore the
7   property, correct?
8   A.    But my point is they still had the money.
9         Q.    Right.
10  A.    So that should have reduced the balance
11  owed.  You have $86,000 here, you owe 140,000 at
12  the time of destruction.  You're holding this
13  money here, you either want to charge me this 145
14  and give me all this 86,000, or you apply the two
15  and net them.
16        Q.    Right.
17  A.    You can't say it's for restoration, you're
18  paying 145 but I'm holding your $86,000.
19        Q.    Well, aren't we only really talking
20  about interest for a time period on the $86,000
21  as being the difference?
22  A.    We're looking at the principal balance at
23  this time.  What's the principal balance of the
24  loan?  I'm more concerned about the principal
25  balance.  There's no argument as to the interest
0217
1   from this side.
2         The argument is you're saying it could be
3   used for restoration.  I'm saying fine, then give
4   me client back the $86,000, and hopefully that
5   would be enough to restore it.  I'm not sure it
6   would.
7         But if they had 86,000 then you're keeping
8   the loan in force.  But in this case the servicer
9   has the 86,000 on behalf of the lender.  So it
10  appears to be that it should have offset and a
11  new principal balance struck, or you would give
12  the money back to the client.
13        Q.    Now isn't the insurance there for the
14  benefit of the lender, I mean, that's why it was
15  required?
16  A.    And if it's for the benefit of the lender
17  it would go to reduce the principal.
18        Q.    Right.  And it did eventually?
19  A.    Yeah, but it didn't go the way it should
20  have.  And that was you had the money, you apply
21  it, if you first go to the specific costs that
22  are there, and then you apply it to the principal
23  balance.
24        Q.    Okay.
25  A.    So had they done that the Alexanders would
0218
1   appear to have about a $70,000 loan balance, give
2   or take a few interest calculation differences
3   possibly, instead of $145,000 balance, which was
4   what they were paying on.
5         Q.    So your calculations are from the date
6   of the check forward?
7   A.    From the date of the check forward.
8         Q.    Okay.  So you're assuming that the
9   lender got the check the day it was dated?
10  A.    Somebody got the check.  I'm assuming
                        Page 90

Alexander vs Countrywide Home (final).txt
11  Countrywide, because Countrywide's named on the
12  check.
13          Q.    Okay.
14  A.    And actually, you know, it's not very clear
15  as to how they applied it.  Again, we're working
16  off a document as to, you know, how the
17  disbursements, you know, they just applied it,
18  like I said, as if the loan was in place.  And my
19  theory is proven by the fact that they're
20  continuing to maintain a balance of 150,000.
21          Q.    Uh-huh.
22  A.    It's impossible.  If it was done -- if we
23  were given back the money and used it for
24  restoration it would be difficult.  But they kept
25  the 86,000 and we're still relatively near the
0219
1   same loan balance we were when the incident
2   happened.  That's what I'm saying.
3           Q.    Okay.  And the data for Exhibits H, I
4   guess Exhibit H.
5   A.    Yeah.
6           Q.    Came from where?
7   A.    The documents that were provided.
8           Q.    Okay, specifically which documents are
9   you referring?
10  A.    Countrywide had an escrow analysis.
11          Q.    Uh-huh.
12  A.    So Countrywide escrow analysis.  So we just
13  basically plotted their analysis and their
14  numbers.
15          Q.    Okay.
16  A.    So these are directly derived from the
17  Countrywide analysis that was provided for
18  insurance and payments.  And that's the point is
19  that as of the incident you have X, you have a
20  balance of X, you get a big chunk in, whether
21  it's used for restoration or not they're still
22  showing 100 something, $140,000 balance.  I mean,
23  the last balance they have is on 11/29/07 they're
24  saying we owe $145,000.  Does that make sense to
25  you, Counsel?
0220
1           Q.    No.
2   A.    Because I'm trying to understand the
3   difference.
4           Q.    Now the Alexanders then have not made
5   a payment since before Hurricane Katrina,
6   correct?
7   A.    Obviously they're making some kind of
8   payments, because aren't you applying payments
9   and reducing the loan balance at the higher
10  amount?
11          Q.    So you don't know where these payments
12  came from though that are on the escrow amount?
13  A.    No.
14          Q.    The payments that you're reflecting,
15  lets just say in '06 and '07, you don't know
16  where those payments are coming from?
17  A.    Nope.  But again it's irrelevant, because
18  there was a lump sum given sometime in '06.  So
19  these payments, if these payments were actually
20  made then there would be more money going toward
21  principal.  Right now more money's going to
                                    Page 91

Alexander vs Countrywide Home (final).txt

18  have that represents carrying the money forward
19  from the balance that we come up with after the
20  payment in January of 60,000 and the interest
21  accumulated to the current as of the time I did
22  the report.  So there would be interest on that
23  60,000.
24          Q.   Okay, so you think that's all the
25  Alexanders owe as of a certain date?
0226
1   A.   As of a certain date, yes.
2          Q.   What's the date?
3   A.   I did it through 11/15/08.
4          Q.   Okay.  You mention a check from the
5   Harrison County Tax Collector from 2007, how does
6   that relate to your opinions?
7   A.   Excuse me, show me where?
8          Q.   On page seven of your report your tax
9   assumption you have a check from the Countrywide,
10  I didn't really follow that, what does that mean?
11  A.   Countrywide received a check back from the
12  Harrison collector, so obviously they overpaid
13  the taxes because they got a refund.
14          Q.   Right.  So how does that influence
15  your opinion?
16  A.   It shows that there was no payments of
17  taxes required after the catastrophe.
18          Q.   How does it show that?
19  A.   Because why would they be given a refund?
20          Q.   Well like you mentioned, they may have
21  paid more than what was assessed.  But does that
22  show that there were no taxes on the property?
23  A.   Well, why would they give a refund?  I
24  don't -- there was no payments of taxes, we
25  didn't see any payments made by Countrywide of
0227
1   taxes, so why would they refund this?
2          Q.   So you saw no evidence that
3   Countrywide paid any taxes on this property?
4   A.   Yeah, we confirmed that taxes were not paid
5   after the disaster, because again this is going
6   by the documents we reviewed.
7          Q.   Uh-huh.
8   A.   That we didn't see any payment of taxes,
9   yet we got a refund after this.
10          Q.   So you saw no payment of taxes from
11  escrow?
12  A.   Yeah.
13          Q.   Okay.
14  A.   That's what we're saying.
15          Q.   And that's from the documents that you
16  previously reviewed?
17  A.   Yeah, that I was given.
18          Q.   Okay.  And those were for a certain
19  period of time?
20  A.   Correct.
21          Q.   Okay.  Do you recall approximately the
22  dates, years?
23  A.   I think they began in like '0-- I think
24  actually from '02 all the way through '07.
25          Q.   Okay.  Your report concludes by
0228
1   mentioning the size of Countrywide, that it's a
2   large company.
                        Page 94

Alexander vs Countrywide Home (final).txt

3    A.    Yeah.
4          Q.    How does the size of Countrywide
5    affect your opinions in this case?  Are you
6    saying that if Countrywide were smaller the
7    standards would be different?
8    A.    Well, one of the things I always, you
9    know -- if you go, um, if you look at
10   Countrywide, um, Countrywide, this is right off
11   their sub-servicing -- this is off their
12   servicing websites.  Countrywide is the largest,
13   most technically advanced and efficient mortgage
14   servicer ever created.
15         To me that means that when you're doing
16   more of these and you're dealing with government
17   and you're doing it you're going to be much more
18   regulated and have, you know, it's like anything
19   else.  Security and Exchange Commission if you
20   have less than 50 shareholders...  so the more
21   you do the more proficient you get at it, the
22   more technology you have behind you.  So clearly
23   they would be setting the standard, in my mind,
24   for servicing.
25         Q.    So you think Countrywide has a higher
0229
1    standard than other lenders?
2    A.    Correct.
3          Q.    Okay.
4    A.    Just as a company in general that services
5    and does banking.
6          Q.    Okay.
7    A.    I think they ---
8          Q.    Is this opinion supported by any
9    authority or documentation which you can cite?
10   A.    Within the profession we get magazines,
11   journals that rank the highest level servicer's,
12   the ones that do the most servicing.  Typically
13   loan originator magazines, mortgage banking
14   association magazines typically cite them as the,
15   you know, most technically advanced.  They tout
16   it on their own website.
17         Q.    But do they say that Countrywide
18   should be held to a higher standard of care?
19   A.    It's implied, in my opinion, that once you
20   become, you know, that level of a Countrywide
21   you're going to be held to a higher level of
22   standard.  You know, not that anybody should be
23   held to a standard, but the more you do, the more
24   you're going to have to deal with regulatory
25   requirements is, I guess, what I'm trying to say.
0230
1          Q.    Okay.  Is this your personal opinion
2    or is it an opinion that is shared by others?
3    A.    It's just it's an opinion that's shared by
4    me and others in the industry.  I mean --
5          Q.    That's my question, who else shares
6    this opinion?
7    A.    Pretty much, I mean, like, I can list, you
8    know, I'm in banking associations, I mean, do you
9    want me to just take out a list and name a lot of
10   them?
11         Q.    Well, I mean, have you discussed this
12   with them?
13   A.    Well, anybody that's a lender for them,
                        Page 95

Alexander vs Countrywide Home (final).txt
```
14   meaning corresponding lender knows the reason you
15   go to them is because they service your clients
16   well.  So from a lending perspective, you know, a
17   perspective of the consumer they service well and
18   stuff like that.  And that's based on, you know,
19   my 13 years having done business with
20   Countrywide, so...
21           Q.   Okay.  I noticed you pulled out quite
22   a bit of documents during your testimony, and
23   there's a list of documents that you've reviewed
24   in your report that's provided to us in
25   Exhibit 1.  Other than the list in your report
0231
1    what other documents have you reviewed in forming
2    your opinions in this case?
3    A.       If you go to the page I would list them in
4    my report.  For the most part the VA guidelines,
5    I list them in my report, I believe it's page 12.
6                MR. GIBSON:  I think the question is
7    what other documents though.
8            Q.   Right, right.
9    A.       Oh, yeah, I gave you the one change to the
10   page, I gave you the one VA guaranty benefit.
11           Q.   Uh-huh.
12   A.       Um, I have a couple of more, you know, just
13   documents that just, you know, just talk about,
14   um, you know, the Federal Trade Commission, you
15   know, Valera.  You know, I saw an article about
16   forced insurance, but we clearly see that
17   Countrywide had the ability to put forced
18   insurance.  Just, you know, their own website,
19   you know.
20           Q.   Okay.  So --
21   A.       Just because --
22           Q.   -- when you mention websites
23   previously then you've provided us with a list of
24   all of the documents that relate to the websites
25   you've been to?
0232
1    A.       I did, I think I believe I put in my page,
2    yeah, page 12.
3            Q.   I don't see any documents regarding
4    the size of Countrywide is the reason I'm asking
5    the question.
6    A.       Yeah, because my report didn't speak to the
7    size of Countrywide, my report spoke to my
8    opinion as to knowing of it.  I mean, I don't
9    need a website to know having done business with
10   them and knowing it.  I just that was a part of
11   the reason why I formulated that opinion, it
12   wasn't a website.
13           Q.   Okay.
14   A.       So, I mean, I'm just giving you my opinion
15   based on having a 13-year experience.
16           Q.   Okay.  And in fairness now your
17   opinions seem to hinge on this Exhibit A notice
18   provision that's required to be given, and you're
19   assuming, I guess, that Countrywide was provided
20   a copy of Exhibit A as part of this process?
21   A.       Well, I think it hinges on a couple of A
22   being one of a critical document, but I also
23   think the initial application of Countrywide
24   being named in that initial insurance
```
Page 96

Alexander vs Countrywide Home (final).txt
```
25  application.
0233
 1          Q.   Right.
 2  A.    Those two documents.  Again, just knowing
 3  it's a VA loan and the procedures in the VA
 4  doesn't mean that something could not have been
 5  followed, but it's a very procedurally driven
 6  loan product.  And, you know, that's really it.
 7  But A-1 would be certainly an important document,
 8  as you referred.
 9          Q.   Okay.
10  A.    But it wouldn't be the sole document.  I
11  also think the fact that you have an application
12  that, you know, that names the Countrywide, you
13  know.  And again, I haven't been given any VA
14  documents or other documents to you telling me
15  this today that possibly that document was never
16  given.
17          Q.   Okay.
18  A.    So again, I'm speaking to the documents.
19          Q.   And you don't know when or if
20  Countrywide accepted or received exhibit D-1
21  either, do you?
22  A.    Well I would know that they would have
23  gotten the policy.  As the servicer they would
24  have gotten the policy.  And since, again, I
25  don't have the full policy.
0234
 1          Q.   Right.
 2  A.    But I'm sure if I got the full policy
 3  Countrywide would be in that policy.
 4          Q.   Uh-huh.
 5  A.    So I can't speak to the second policy,
 6  because obviously their name's not on it.  But
 7  certainly the first one, even if they didn't get
 8  the A-1 they would have required the insurance
 9  policy.
10          Q.   Uh-huh.  But now this application was
11  taken at closing, I guess, or prior to closing.
12  A.    Uh-huh.
13          Q.   And State Farm flood insurance was in
14  place at the time of closing.
15  A.    Right, and for the whole year, right.
16          Q.   Whether that was for January 2002.
17  A.    Right.
18          Q.   In March of 2002 the Alexanders
19  purchased the flood policy from Allstate
20  Insurance, correct?
21  A.    According to the escrow documents, yes.
22          Q.   Okay.  Do you know whether or not
23  Countrywide started servicing this loan before
24  March of 2002?
25  A.    Do I know if Countrywide -- March of -- I
0235
 1  believe they started it -- I don't know, hold on
 2  a second.
 3          Q.   Well do you know?
 4  A.    I don't know.  I only -- they gave me an
 5  analysis of their escrow from 3/12/2002.
 6          Q.   Okay.
 7  A.    So that's, you know.
 8          Q.   So it's possible that the State Farm
 9  policy might not have even been in effect when
```
                            Page 97

Alexander vs Countrywide Home (final).txt
```
10  Countrywide started servicing the loan, right?
11  A.    Anything's possible.
12        Q.    Okay.  Who else have you discussed
13  this case with, other than Counsel for the
14  Alexanders?
15  A.    Other than my staff, nobody, I would not go
16  outside.
17        Q.    Okay.  Are you familiar with the
18  servicing handbook that the Department of
19  Veterans Affairs puts out for servicer's?
20  A.    They have it on their website.
21        Q.    Okay.  Have you reviewed it?
22  A.    No, I did not.
23        Q.    Okay.
24  A.    I mean, not for this case.  I've seen it
25  and I've read it if you're asking me that.
0236
1         Q.    Okay.  But you did not think it was
2   related in anyway to this case?
3   A.    And I cautioned you why I didn't.  Because
4   Countrywide could have -- has a specific service
5   agreement, I'd much rather speaking to the actual
6   servicing agreement between Countrywide.
7         Would most of that be in it?  Yes, I guess.
8   But I would like to see the one that Countrywide
9   has, and I would review that.  I possibly would
10  refer to that after seeing Countrywide's, but I
11  would not want to make that my premise for coming
12  to a conclusion when there's a document that's
13  much more meaningful, like the actual Countrywide
14  VA servicing agreement.  So that was the reason.
15        Q.    Okay.  Have you reviewed the report of
16  Countrywide's expert Mr. Don Coker?
17  A.    No.
18        Q.    Do you plan to offer any testimony
19  regarding his report at this time?
20  A.    At this time I have not been asked to.
21        Q.    Okay.  Have you reviewed any of the
22  pleadings in relation to this case?
23  A.    Yes, I have.
24        Q.    What have you reviewed?
25  A.    The actual complaint documents, you know,
0237
1   pretty much the standard documents that are
2   associated with the complaint.
3         Q.    Okay.  That's all of the questions I
4   have.
5         MR. GIBSON:  Off the record.
6         (A discussion off the record was had.)
7   CROSS EXAMINATION
8   BY MR. GIBSON:
9         Q.    All right, I've just got a few
10  followup questions to ask you, Mr. Petrucelli.
11  And first there was some discussion in the
12  beginning of the deposition about a statement
13  that you made in the introduction that
14  Countrywide was a division of Countrywide Bank
15  and whether they were governed by the Department
16  of Thrift Supervision or the FDIC.  Now, is your
17  opinion based on whether or not Countrywide is a
18  bank?
19  A.    No.
20        Q.    Okay.  And would your opinion change
                    Page 98
```

Alexander vs Countrywide Home (final).txt

13  insurance proceeds then there are prepayments in
14  the deed of trust?  I mean, we have other
15  paragraphs that relate to insurance proceeds,
16  don't we?
17  A.    Yes.
18         Q.   Okay.
19  A.    But you asked me in the question, and I
20  couldn't read it, was what was our basis for
21  applying the proceeds.
22         Q.   Right.
23  A.    And it says that any proceeds or any
24  pre-penalty -- any prepayment and the fact that
25  they didn't give the money to our borrowers and
0248
1  they required the money to be paid to them we
2  deemed that a prepayment, that would be deemed a
3  prepayment by anybody that was in our industry.
4         If our client gave us money and we had an
5  outstanding loan balance we would deem that a
6  prepayment.  So we don't look to it as whether it
7  was insurance payments.  You could, you know, you
8  can say that it could have been applied to
9  restoration, but that would mean the money was
10  paid out to someone other than the lender.
11         So if it becomes a prepayment, which is my
12  opinion and my interpretation of that payment,
13  then it falls under that, it must be applied
14  within 30 days.  There was no communication that
15  I viewed in the documentation that said it was
16  going to be applied to restoration and not the
17  loan balance.
18         So that was -- I gave you my -- you asked
19  me how did I arrive at it?  I knew it was on the
20  document, I just couldn't read it.  And that was
21  to clarify how I drew my conclusion and how I
22  applied it and formulated my number of the
23  70,000, I was trying to explain to you how I
24  arove at my number and the basis on how we viewed
25  it.
0249
1         Q.   Okay.  So you assume that it was a
2  prepayment --
3  A.    Right.
4         Q.   -- the $86,000?
5  A.    Barring anything else that we have been
6  given that's the way it appears from our review
7  of the documents that we have at this point.
8         Q.   Okay.  Did you review, and you
9  mentioned just now rebuilding, did you review any
10  of the call logs regarding the conversations
11  between the Alexanders and Countrywide regarding
12  the rebuilding process?
13  A.    No, I have not.
14         Q.   Okay.  That's all I've got, thank you.
15         (Adjourned at 2:00 p.m.)
16
17
18
19
20
21
22
23